STATE EX REL. CAMPBELL ET AL., RELATORS, *v.* STEWART, GOVERNOR, ET AL., RESPONDENTS.

(No. 4,202.)

(Submitted March 25, 1918.   Decided March 27, 1918.)

[171 Pac. 755.]

*War Defense Act — Constitution — Title — Appropriations — Donations—Lending State's Credit—"Debt"—State Bonds.*

Constitution—Character of Instrument.
    1.   The provisions of the Constitution cannot be suspended, without its authority, for any reason, and are therefore as binding in time of war as in time of peace.
Same—War Defense Act—Title—Sufficiency.
    2.   *Held,* that the War Defense Act (Chap. 21, Ex. Sess. 1918) has to do with but one subject, which is clearly expressed in its title, *viz.:* "to assist the United States in carrying on and prosecuting the

war now existing between the United States and the German and Austrian empires," and therefore does not contravene the provisions of section 23, Article V, of the Constitution.

[As to the effect of constitutional provision requiring a statute to embrace but one subject, which shall be expressed in the title, see note in 61 Am. Dec. 337.]

Same—Appropriations—Separate Bill.

3. The Act *supra* is not subject to the constitutional objection that, while it appropriates money such appropriation is not made by a separate bill embracing one subject, as required by section 33, Article V, of the Constitution.

Same—Appropriations—Charitable Purposes.

4. The Act above is not objectionable as appropriating money for charitable, industrial or benevolent purposes "to any person, corporation or community not under the absolute control of the state," within the meaning of section 35, Article V, of the Constitution.

Same—Gifts—Donations—Lending State's Credit.

5. The Act is not repugnant to section 1, Article XIII, of the Constitution, forbidding the state from making loans, giving credit or making gifts or donations to persons, corporations or associations.

Same—Appropriations—Defense of Nation.

6. The purpose of Chapter 21, Ex. Sess. Laws, 1918, being to assist in the defense of the United States, the appropriation made therein falls within the exception found in section 12, Article XII, of the Constitution, under which the legislature may properly make an appropriation without a fund behind it, and without provision having first been made for levying a tax to furnish such fund, it in these circumstances having the power to authorize any proper public agency to procure the necessary funds by borrowing, *i. e.*, the sale of bonds.

Same—"Debt"—Act Does not Create.

7. The Act does not create a "debt" within the meaning of section 2, Article XIII, of the Constitution, forbidding the creation of a debt without providing by irrepealable law for the levy of a tax until the indebtedness therein provided shall have been fully paid or discharged.

Statutes—Constitutionality—How Determined.

8. No Act of the legislature will be pronounced unlawful unless its nullity is made manifest beyond a reasonable doubt.

Original application by the State, on the relation of Will A. Campbell and others, for writ of injunction against Samuel V. Stewart, Governor, and others, as members of the State Board of Examiners. Demurrer to complaint sustained and proceeding dismissed.

*Messrs. Gunn, Rasch & Hall, Mr. H. S. Hepner, Mr. Wm. T. Pigott, Mr. Wm. Scallon, Mr. O. W. McConnell* and *Mr. C. B. Nolan,* for relators, submitted a brief; *Mr. Pigott, Mr. Nolan* and *Mr. Scallon* argued the cause orally.

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for Respondents, submitted a brief; *Mr. Woody* argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

Suit to enjoin the issuance and sale of bonds under the authority of Chapter 21, Extra Session Laws of 1918, known as the War Defense Act. The title of the Act is as follows: "An Act appropriating the sum of five hundred thousand dollars to be expended by the Montana council of defense in aiding and assisting the United States in the carrying on and prosecuting of the war now existing between the United States and the German and Austrian empires; designating the purposes for which such appropriation may be expended by the Montana council of defense; authorizing the state board of examiners to issue bonds or warrants in excess of the constitutional limit of indebtedness and to levy a tax upon all property in the state subject to taxation for the purpose of paying the indebtedness so incurred, and the payment of the interest thereon; authorizing the Montana council of defense to make and adopt rules and regulations governing the expenditure of such money and to enter into any and all contracts which the Montana council of defense may deem necessary and proper in connection with the expenditure thereof; and authorizing the state board of examiners to make temporary loans for such sum or sums as may be necessary to meet such appropriation when there is insufficient unappropriated money in the state treasury in the war defense fund for such purpose."

The pertinent provisions of the Act are:

"Section 1. The board of examiners of the state of Montana is hereby authorized and empowered to borrow any sum of money in an amount not exceeding five hundred thousand dollars upon the credit of the state of Montana, and there is hereby appropriated five hundred thousand dollars or so much thereof as may be necessary out of the receipts of any such loan or loans so made, under the provisions of this Act for the purpose of aid-

ing and assisting the United States in carrying on and prosecuting the war and for repelling invasion and suppressing insurrection.

"Section 2. The money hereby appropriated may be expended by the Montana council of defense, with the approval of the state board of examiners, by loan, for the purpose of encouraging, aiding and assisting those engaged in agricultural pursuits, in procuring seed, in planting, sowing, raising and harvesting crops, and in procuring labor and assistance necessary for such purposes, for the purpose of encouraging, aiding and assisting farmers and stock-growers in procuring livestock and feed for the same, and in raising livestock, and in procuring labor and assistance necessary for such purposes, and for the purpose of transporting and aiding and assisting in the transportation and marketing of crops and livestock, to the end that the food supplies of the nation may be sufficient and adequate for the support of its armies, and for all other purposes public exigencies may require for the support, aid and assistance of the United States in carrying on and prosecution of such war."

"Section 7. The board of examiners of the state of Montana is hereby empowered and authorized to issue bonds or warrants in a sum not exceeding five hundred thousand dollars at an interest-bearing rate not to exceed six per cent per annum and upon such other terms and conditions as such board may deem wise, proper and necessary to obtain funds sufficient to meet any loans or expenditures made under the provisions of this Act: *Provided,* however, that the life of any such bonds issued shall not be greater than five years and may be redeemed at any interest-paying period or within thirty days thereafter."

"Section 14. This Act and all of its provisions is for the purpose of aiding and assisting the United States in carrying on and prosecuting the war now existing between the United States and the German and Austrian empires and all other enemies and to repel invasion and suppress insurrection, and for no other purpose."

The complaint avers that pursuant to said Act the defendants, proceeding as the state board of examiners, have resolved to issue, have advertised that they will offer for sale, and do threaten to issue and sell bonds of the state in the sum of $500,000, to be dated March 20, 1918, bearing interest at six per cent, interest payable semi-annually, said bonds to be due in five years, but redeemable at the option of said board or within thirty days after any interest-bearing period; that the Act above mentioned and pursuant to which the defendants are proceeding is void as in contravention of the provisions of sections 23 and 33 of Article V, section 35 of Article V, section 12 of Article XII, section 1 of Article XIII, and section 2 of Article XIII of the state Constitution; and that the relators, as taxpayers, will be greatly and irreparably injured and damaged, should said bonds be sold and delivered to the purchasers thereof.

Responsive to an order to show cause, the defendants have appeared, and by general demurrer they join issue upon the question of law now before us, to-wit, whether the Act is contrary to the Constitution in the respects alleged.

We .desire at the outset to express to counsel of record our appreciation of their efforts to aid us in the solution of this problem. We likewise wish to disclaim any view that the [1] Constitution of this state is in abeyance because the nation is at war; or that the Constitution is inadequate to serve the state at such a time, or that the exigency justifies or has called forth any canon of construction not applicable in a season of "profoundest peace." Whatever is legally done by any public agency at any time must be done either with the sanction or without the inhibition of the Constitution; for, like the national charter, it "is a law for rulers and people, equally in war and peace, and * * * no doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended" without its authority for any reason. (*In re McDonald,* 49 Mont. 454, Ann. Cas. 1916A, 1166, L. R. A. 1915B, 988, 143 Pac. 947; *Ex parte Milligan,*

4 Wall. (U. S.) 2, 18 L. Ed. 281.)   So premising, we come to the matter in hand.

1. The respects in which it is alleged that sections 23 and 33 [2, 3]  of Article V have been contravened are: "That said Act contains more than one subject, and each of the subjects is not clearly expressed in the title," and "said Act appropriates money, but such appropriation is not made by a separate bill embracing one subject." Upon argument these objections were abandoned, and we think properly so, because they are groundless. Assuming that the Act is one of appropriation, such appropriation is for only one subject, clearly indicated in both the title and the body of the Act, namely, "to assist the United States in carrying on and prosecuting the war now existing between the United States and the German and Austrian empires." This is a particular purpose, defined as well as it can be. The other clauses of the title and the other provisions of the Act have to do with ways and means for carrying out such purpose; they are not separate purposes, and thus do not render the Act obnoxious to the sections referred to. (*State ex rel. Hay* v. *Alderson,* 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210; *Hill* v. *Rae,* 52 Mont. 378, Ann. Cas. 1917E, 210, L. R. A. 1917A, 495, 158 Pac. 826.)

2. Nor, with equal propriety, do the relators place any [4]  reliance upon the alleged departure from section 35 of Article V. That section forbids appropriations for "charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state." This is manifestly not such an appropriation, and the mere fact that the moneys may be effective through individuals, associations or corporations in certain ways does not make it so. (*State ex rel. Cryderman* v. *Wienrich, ante,* p. 390, 170 Pac. 942.)

3. The same considerations avail to clear the Act of any [5]  repugnance to section 1 of Article XIII. This is primarily not an Act "to authorize the state to loan, give or extend its credit to or in aid of individuals, associations or corporations,"

nor "to make donations or gifts to individuals, associations or corporations," nor "to loan state funds to or in aid of individuals, associations or corporations," nor to authorize the "use of public funds or moneys of the state for private purposes"; on the contrary, if it is any of these things, it is so only secondarily or incidentally. The purpose of the Act, as apparent on its face and as emphasized in section 14, is the most public one that could well be imagined. . (*City of Lowell* v. *Oliver,* 8 Allen (Mass.), 247; *Freeland* v. *Hastings,* 10 Allen (Mass.), 570; *Franklin* v. *State Board of Examiners,* 23 Cal. 173; *People* v. *Pacheco,* 27 Cal. 175.) The United States is at war, and to assist the United States in war is expressly recognized by the Constitution as a proper and probable occasion for the use of state funds (Const., Art. XII, sec. 12). Moreover, this state, as one of the United States, is at war; when aiding the United States, this state but defends itself, and thus exercises the highest attribute, as it observes the most solemn duty, of sovereignty. That in pursuing this public purpose the state, through its legislature, may adopt or prescribe any mode or means reasonably adapted to accomplish such purpose is too well settled for debate. And if it be true that an "army travels on its stomach," then to enlarge the food production, as this Act designs, is as essential and important an aid to war as the furnishing of munitions or the equipping of men. The events of the past three years, as of all previous history, bear eloquent testimony to the vast, if not paramount, importance of food production, not only for armies but for the people behind the armies, as a measure of war; and though in the last analysis such production harks back to the "individual, association or corporation," and though, to stimulate such production, either gifts or loans are employed, the outstanding and controlling public purpose is the end that justifies and validates the means. (*State ex rel. Cryderman* v. *Wienrich, supra; Daggett* v. *Colgan,* 92 Cal. 53, 27 Am. St. Rep. 95, 14 L. R. A. 474, 28 Pac. 51; *Norman* v. *Kentucky Board, etc.,* 93 Ky. 537, 18 L. R. A. 556, 20 S. W. 901.)

4. We come, then, to the provisions of section 12, Article XII,
[6]   and these, so far from being violated by the Act before us,
are in a sense the warrant for its existence.   This section pro-
vides: "No appropriation shall be made or any expenditures
authorized by the legislative assembly whereby the expenditures
of the state during any fiscal year shall exceed the total tax
then provided for by law, and applicable to such appropriation
or expenditure, unless the legislative assembly making such
appropriation shall provide for levying a sufficient tax, not ex-
ceeding the rate allowed in section 9 of this Article, to pay such
appropriations or expenditures within such fiscal year. *This
provision shall not apply to appropriations or expenditures to
suppress insurrection, defend the state, or assist in defending
the United States in time of war.*" If this very clear language
has any meaning, it is that, whereas the legislative power over
appropriations and expenditures, unlimited save as restricted
by the Constitution, is in fact restricted as above set forth, such
restriction does not apply to appropriations or expenditures to
suppress insurrection, defend the state, or assist in defending
the United States in time of war; and therefore, for such pur-
poses, the power of the legislature stands without limit or re-
striction.   (*People* v. *Pacheco, supra; In re State Board of
Equalization,* 24 Colo. 446, 51 Pac. 493.)   So, conceding that
the Act before us does not attempt to meet the restriction above
set forth, its validity is unaffected by that fact, because, if it is
an Act of appropriation, the appropriation is for purposes which
take it out of the range of the restriction.   Is this, then, an Act
of appropriation?   We think it is both an Act of appropria-
tion and an Act to authorize expenditures.   Its title proclaims
it as "an Act appropriating the sum of" $500,000, "   *   *   *
designating the purposes for which such appropriation may be
expended"; and this proclamation is borne out by the language
of section 1, "There is hereby appropriated," and of section 2,
"The money hereby appropriated may be expended," *etc.,* and
of section 6, "The Montana council of defense shall adopt rules
*   *   *   governing   *   *   *   the expenditure of the money

hereby appropriated," and of section 9, "The money appropriated by this Act shall be credited," *etc.*, and of section 11, "Any premiums required * * * may be paid out of the money appropriated by this Act," and of section 12, "The Montana council of defense shall keep * * * accounts * * * of the money hereby appropriated," and of section 14, "Upon the termination of such war the power * * * to expend the money hereby appropriated shall cease," *etc.* Indeed, there is nothing at all to suggest that the Act is not an Act of appropriation save the absence of funds in hand to meet it, and the first clause of the Act, granting authority to the board of examiners to borrow whatever sum, not exceeding the amount of the appropriation, necessary to create a fund to answer to the appropriation. But it is entirely clear that neither of these suffices to characterize the Act as other than an appropriation. Its purpose is to defend the state and to assist in the defense of the United States, and by the very language of section 12, Article XII, such a purpose may be served by an appropriation which has no funds behind it nor any provision to furnish such a fund through taxation. Obviously the appropriation is made to be used, but not even the state can spend money which it does not possess; and the only way the money not possessed can be gotten is by taxing or borrowing. If then, the legislature can, under the Constitution, make an appropriation for war purposes, without a fund and without a tax to furnish the fund, it must be possible for that body to make an appropriation, authorizing any proper public agency to procure so much of the money as may be required by borrowing it; and this is the office performed by the first clause of the Act, elaborated later in section 7 of the Act.

5. This brings us to the last objection, *viz.*, that the Act [7] creates a debt without providing by irrepealable law. "for the levy of a tax sufficient to pay the interest and to extinguish the principal of such debt, within the time limited by such law for the payment thereof." If this Act creates a debt within the meaning of this section, then undoubtedly it is void, for no pro-

vision such as this section requires, is made. But to sustain this objection would be to nullify all we have just said; for if the legislature can make an appropriation for war purposes without funds and without a levy of taxes to meet the appropriation, by authorizing the creation of such fund by borrowing, it cannot be that the very thing not necessary for the appropriation is necessary to create the fund to make the appropriation effective. It should be noticed that the Act does not in terms create a debt nor authorize the creation of a liability in a sum certain. It empowers the board of examiners to borrow "any sum *not exceeding* $500,000," to "issue bonds or warrants in a sum *not exceeding* $500,000 at an interest-bearing rate *not to exceed* six per cent" upon such terms and conditions "as such board may deem wise, proper and necessary," provided "the life of any such bond issue shall *not be greater* than five years and may be redeemed at any interest-bearing period or within thirty days thereafter." How, under these provisions, could the legislature comply with section 2 of Article XIII? What part of the appropriation would be needed, what amount would be borrowed, what bonds or warrants would be issued, what interest they would bear, what time they would run, were all unknown quantities; yet all quantities requisite to the provision demanded by section 2 of Article XIII. Must we then conclude that for this very reason the Act is void, notwithstanding the power recognized by section 12 of Article XII? Or must the answer be that this Act does not create a debt within the meaning of section 2 of Article XIII? The latter, we think, must be the answer, because the very terms of the section imply and contemplate a specific obligation created by the legislature itself, of such a character that computation will disclose in advance what tax levy is requisite to pay the interest on and to extinguish the debt at its certain maturity. As aptly said by counsel: "It would be idle to assume that the legislature should provide for the payment of an indebtedness of $500,000 when no such indebtedness might come into existence at all. Whether $500,000 would be expended or a less amount depends entirely

upon the action of the council and depends likewise upon the continuance of the war. It is possible that the war may terminate without $30,000 of this money being invested or expended, and the anomalous situation would be presented that taxes would be collected to pay $500,000 indebtedness when as a matter of fact only $30,000 of indebtedness had been contracted.''

In reaching our conclusion we need not assert that we are **[8]** altogether free from doubt; but doubt is not sufficient to overturn an Act of the legislature. In the case of a statute assailed as unconstitutional, we stand committed to the rule that no such enactment will be pronounced invalid unless its nullity is made manifest beyond a reasonable doubt. (*Spratt* v. *Helena Power etc. Co.*, 37 Mont. 60, 94 Pac. 631; *State ex rel. Hay* v. *Alderson, supra.*) In respect of the Act before us we cannot say that this has been done; on the contrary, our views incline us to hold that it is a valid exercise of the legislative power, and that the bonds proposed to be issued pursuant to its provisions will become legal charges against the state.

The demurrer to the complaint is therefore sustained, and, as we are advised that the relators cannot plead to further effect, a decree of dismissal must be entered. So ordered.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.