STATE EX REL. MILLS, RELATOR, *v.* DIXON ET AL., RESPONDENTS.

(No. 5,260.)

(Submitted January 31, 1923. Decided February 10, 1923.)

[213 Pac. 227.]

*Constitution—Soldiers and Sailors—"Bonus Bill"—Taxation— Gratuities—Statutes—Claims Against State—Payment—Legal and Moral Obligations—War—Termination.*

Statutes—Constitutionality—Presumptions.
    1. On appeal, the constitutionality of a statute is *prima facie* presumed, and every intendment in its favor will be made unless its unconstitutionality appears beyond a reasonable doubt.

Constitution—Gratuities—Inhibition Binding upon Legislature and People.
    2. The inhibition of the state Constitution (Art. XIII, sec. 1) against making donations by the state or any subdivision thereof or loaning its credit, to any individual, corporation, *etc.*, is both mandatory and prohibitory, applicable alike to the legislative assembly and the people in their legislative capacity.

War—Defense of Nation—Duty of Individual—Compensation.
    3. *Held*, that no legal duty rests on the state to reward those who fought in the late World War; that the individual owes the duty to society to come to the defense of his country in time of war, insurrection or invasion, whether compensated or not.

Constitution—Taxation—"Public Purposes"—Definition.
    4. *Held*, that the words "public purposes" as used in section 11, Article XII of the state Constitution, providing that taxes shall be collected for public purposes only, are synonymous with "governmental purposes."

[66 Mont. 76.]

War—Gratuity to Ex-service Men—Unconstitutionality of "Bonus Bill."
    5. *Held*, that the payment of a bounty to those who served in the
military establishment of the United States during the World War,
contemplated by Chapter 162, Laws of 1921, by means of a tax
levy for that purpose, is not for a public or governmental purpose
but intended as a donation or gift contrary to the provision of sec-
tion 1, Article XIII of the Constitution.

Same—Compensation to Ex-service Men—Moral Obligation of State In-
sufficient to Uphold Act.
    6. The law recognizes legal, not moral, obligations, and what may
not be compelled by legal action is a gratuity; hence the claim that
Chapter 162, Laws of 1913, providing a bounty for ex-service men
cannot be upheld on the alleged ground that the state is under the
moral obligation to compensate them for services rendered during the
war.

Statutes—Constitutionality—Duty of Courts.
    7. In determining the constitutionality of a statute, courts are not
concerned with the wisdom, policy or expediency of the Act, but are
bound by the provisions of the Constitution.

Claims Against State—Payment—Authorization Necessary.
    8. A "legal claim" against the state is one previously authorized
by law, and under section 29, Article V of the Constitution, pay-
ment of a claim not so authorized is expressly prohibited.

War—Termination—Date.
    9. *Held*, that the World War was not terminated with the armis-
tice, which amounted to no more than a cessation of hostilities, but
was ended on July 2, 1921, by Act of Congress.

Original application for Writ of Injunction by the State, on
the relation of R. M. Mills, against Joseph M. Dixon, as Gov-
ernor, and others, constituting the State Board of Examiners.
Writ granted.

*Mr. R. M. Mills*, Relator, appeared in person but submitted
neither brief nor made oral argument.

*Mr. Wellington D. Rankin*, Attorney General, and *Mr. A. H.
Angstman*, Assistant Attorney General, for Defendants, sub-
mitted a brief; *Mr. Rankin* argued the cause orally.

The Act does not provide for loaning or giving the credit of
the state to individuals or amount to a gift, within the mean-
ing of section 1 of Article XIII of our Constitution.

---

5. Constitutionality of statutes providing for bounty or pension for
soldiers, see notes in Ann. Cas. 1913B, 953; 7 A. L. R. 1636; 13 A. L. R.
587; 15 A. L. R. 1359; 22 A. L. R. 1542.

There is no substantial difference between the purpose of this Act and the Act of March 4, 1919, known as the Veterans' Welfare Act. (Chap. 105, 1919.) This court held that the latter Act was constitutional in the case of *State ex rel. Casteel* v. *State Board of Examiners,* 56 Mont. 621, 190 Pac. 1117. Section 4 thereof was as follows: "The purpose of this Act is for the encouragement, aid and assistance of soldiers of the United States going to and returning from the war in which the United States is fighting Germany and her allies; to get jobs and employment, to provide for the education, training and comfort and the physical and material well-being of those who have been in the military and naval service of the United States during the war." By section 7 the commission was empowered to make grants or loans to ex-service men. The complaint in that case alleged that the Act was in conflict with sections 1 and 2 of Article XIII, section 12 of Article XII and section 35 of Article V of the Constitution. The court sustained the Act. We believe the principles involved in this case are the same as those in the *Casteel Case* and that the decision in that case is decisive of this.

The language used by this court in the case of *State ex rel. Campbell* v. *Stewart,* 54 Mont. 504, Ann. Cas. 1918D, 1101, 171 Pac. 755, in sustaining the war defense bonds, is equally applicable to this case.

Statutes very similar to ours providing for a cash bonus have been held valid under similar constitutional provisions in other states. The supreme court of Washington in the case of *State ex rel. Hart* v. *Clausen,* 113 Wash. 570, 31 A. L. R. 580, 194 Pac. 793, had this question under consideration and upheld the legislation upon the ground that there existed a moral and honorable claim by ex-service men on the public treasury of the state and that the case was for a public purpose rather than private and sustained the Act. We adopted the Washington statute with only slight modifications after it had been upheld by the supreme court of Washington.

The same conclusion was reached by the supreme court of Wisconsin in the case of *State ex rel. Atwood* v. *Johnson,* 170

Wis. 218, 175 N. W. 589. In that case the complaint raised the same objection that is raised in this case under a similar constitutional provision. In the opinion the particular section of the Constitution is not discussed but the court held that the Act was designed to serve a public rather than a private purpose and for that reason upheld the legislation.

The supreme court of South Dakota in the case of *State ex rel. Morris* v. *Handlin,* 38 S. D. 550, 162 N. W. 379, held that a cash bonus to members of the National Guard who served on the Mexican border was not a donation within the meaning of section 1, Article XIII of the Constitution of that state.

The supreme court of California sustained its Educational Bonus Act in the case of *Veterans' Welfare Board* v. *Riley* (Cal.), 22 A. L. R. 1531, 208 Pac. 678, and in *In re Opinion of the Justices,* 211 Mass. 608, 98 N. E. 338, the supreme court of Massachusetts upheld the constitutionality of a proposed bill granting a cash bonus to Civil War Veterans. (See, also, *State ex rel. Atwood* v. *Johnson,* 170 Wis. 251, 176 N. W. 224. See, also, *Mackey* v. *Reeves,* 44 S. D. 153, 182 N. W. 700; *Gustafson* v. *Rhinow,* 144 Minn. 415, 175 N. W. 903; *Veterans' Welfare Board* v. *Riley,* 188 Cal. 607, 206 Pac. 631; *State ex rel. Atwood* v. *Johnson,* 170 Wis. 218, 175 N. W. 589.)

The supreme court of New York reached a contrary conclusion in the case of *People* v. *Westchester County Nat. Bank,* 231 N. Y. 465, 132 N. E. 241. It specifically held, however, that the granting of the bonus and the raising of the money with which to pay it was a public purpose. Having held that the legislation was for a public purpose the case comes within the principles announced by this court in the case of *State ex rel. Campbell* v. *Stewart,* 54 Mont. 504, Ann. Cas. 1918D, 1101, 171 Pac. 755. If it is for a public purpose then the fact that private individuals derive a benefit therefrom is immaterial. They do so only secondarily.

The supreme court of California adopted part of the reasoning of the New York court in the case of *Veterans' Welfare Board* v. *Jordan* (Cal.), 22 A. L. R. 1515, 208 Pac. 293, but

held also that the California statute providing for loaning
money to ex-service men to enable them to buy farm lands
was for a public purpose.

The purpose of the Act in question as shown by its title is
to promote the spirit of patriotism and loyalty and in testi-
mony of the gratitude of the state of Montana. This is a
public purpose for which public money may be expended.
The legislation is not subject to the objection urged, because
of the moral obligation on the part of the state toward the
ex-service men as pointed out by the supreme court of Wash-
ington and because of the public purpose involved.

The taxes authorized by the Act are for public purposes.
Section 11 of Article XII of the Constitution provides in part
as follows: "Taxes shall be levied and collected by general
laws and for public purposes only." In every state where
an Act providing for compensation to ex-service men has
been before the court, the court has taken the view that the
purpose of the Act is public within the meaning of similar
constitutional provisions. The supreme court of New York
in *People* v. *Westchester County Nat. Bank,* 231 N. Y. 465, 132
N. E. 241, though holding the Act invalid for other reasons, so
held. (See, also, *State ex rel. Atwood* v. *Johnson,* 170 Wis.
251, 176 N. W. 224; *State ex rel. Morris* v. *Handlin,* 38 S. D.
550, 162 N. W. 379; *Gustafson* v. *Rhinow,* 144 Minn. 415, 175
N. W. 903; *Mackey* v. *Reeves,* 44 S. D. 153, 14 A. L. R. 1145,
182 N. W. 700; *Wheelon* v. *South Dakota Land Settlement
Board,* 43 S. D. 551, 181 N. W. 359; *State ex rel. Hart* v.
*Clausen,* 113 Wash. 570, 13 A. L. R. 580, 194 Pac. 793;
*Veterans' Welfare Board* v. *Jordan* (Cal.), 22 A. L. R. 1515,
208 Pac. 284; *Bauernfeind* v. *Nestos* (N. D.), 189 N. W. 506;
*Veterans' Welfare Board* v. *Riley* (Cal.), 22 A. L. R. 1531,
208 Pac. 678.)

The Act does not violate section 13, Article XV of the Con-
stitution. This section reads as follows: "The legislative as-
sembly shall pass no law for the benefit of a railroad or other
corporation, or any individual or association of individuals,
retrospective in its operation, or which imposes on the people

of any county or municipal subdivision of the state, a new liability in respect to transaction or considerations already passed." (*State ex rel. Hart* v. *Clausen*, 113 Wash. 570, 13 A. L. R. 580, 194 Pac. 793; *State ex rel. Atwood* v. *Johnson*, 170 Wis. 251, 176 N. W. 224.)

Mr. *Chas. E. Pew*, Mr. *Loy Molumby*, Mr. *Francis A. Silver*, ·Mr. *C. Thomas Busha*, Mr. *I. S. Crawford*, and Mr. *Edward Horsky*, *Amici Curiae*, submitted a brief in support of the constitutionality of the Act; Mr. *Pew* argued the cause orally.

Mr. *Paul W. Smith*, Mr. *W. R. Flachsenhar*, Mr. *G. G. Harris*, Mr. *Bird M. Justason*, Mr. *C. F. Maris*, Mr. *Stephen Tighe*, Mr. *Frank P. Gault*, Mr. *John M. Gault*, Mr. *Max Kuhr*, Mr. *Chas. B. Elwell*, Mr. *A. F. Lamey*, Mr. *Howard A. Johnson*, Mr. *Frank T. Hooks*, Mr. *W. Holman*, Mr. *George F. Shelton*, Mr. *James H. Higgins*, Mr. *E. C. Kurtz*, Mr. *Geo. Carmody*, Mr. *Jess H. Stevens*, Mr. *E. K. Cheadle*, Mr. *F. W. Carolan*, Mr. *Julius Wuerthner*, Mr. *M. S. Cohen*, Mr. *Alex Levinski*, Mr. *R. V. Bottomly*, Mr. *D. J. Sias, Jr.*, Mr. *E. J. Cummins*, Mr. *O. K. Grimstad*, Mr. *Donald Loehl*, Mr. *Chas. Tyman*, and Mr. *A. C. Baird*, *Amici Curiae*.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an original application for an injunction. The defendants interposed a demurrer to the complaint, and thus the case is before us on the facts appearing in the complaint. The constitutionality of Referendum Measure No. 25, approved March 5, 1921, found in Chapter 162 of the Laws of 1921, is assailed on several grounds. At the general election held November 7, 1922, it was approved by the people by a vote of 67,463 for and 62,100 against the measure, and was thereafter, on December 15, 1922, duly and regularly declared by the Governor a law of the state. The Act provides for adjusted compensation to each soldier who served in the military or naval forces of the United States during the war between the United States and the German Empire and its

allies between the sixth of April, 1917, and the eleventh day of November, 1918; and to this end and for that purpose the state board of examiners are authorized to issue and sell bonds pledging the credit of the state in the sum of $4,500,000 in excess of the constitutional limit of indebtedness over and above any bonded indebtedness incurred and for which the state is now obligated.

Section 1 of the Act provides: ''In order to promote the spirit of patriotism and loyalty, in testimony of the gratitude of the State of Montana, and in recognition of the splendid services of Montana men in the war between the United States and the German Empire and its allies, there shall be paid to each person who was regularly called, enlisted, drafted, inducted or commissioned and who served on active duty in the army, navy or marine corps of the United States between the sixth day of April, nineteen hundred and seventeen and the eleventh day of November, nineteen hundred eighteen for a period longer than two months; and to each person who, being a citizen of the United States at the time of entry therein, served on active duty in the naval, military or air forces of any of the governments associated with the United States during the war with the central allied powers between the sixth day of April, nineteen hundred seventeen and the eleventh day of November, nineteen hundred eighteen, for a period longer than two months; and at the time of his call, enlistment, induction, commission or service, was a bona fide resident of the state of Montana, the sum of ten dollars ($10.00) for each month or major fraction thereof that such person was in active service, not to exceed however, a total sum of two hundred dollars ($200.00) : provided, that persons who have received extra compensation from any other state, or nation other than the United States for such active service shall not be entitled to compensation under this Act unless the amount of compensation so received is less than they would be entitled to hereunder, in which event they shall receive the difference between the compensation allowable under this Act and the extra compensation already received

from such other state or nation, provided, further, that persons who have received greater compensation than the regular pay of the army, navy, or marine corps and commutation for quarters and subsistence, shall not be entitled to receive compensation under this Act unless the amount of the extra compensation so received is less than they would be entitled to hereunder, in which event they shall receive the difference between the compensation allowable under this Act and such extra compensation. In case of the death of any such person while in such service an equal amount shall be paid to his surviving widow, if not remarried at the time compensation is requested, or in case he left no widow and left children, then to his surviving children, or in the event he left no widow or children, then to his surviving parent or parents if actually dependent upon such deceased person for support. Persons of the female sex, or their surviving children or parents, who are in all other respects within the terms of this Act, shall be entitled to compensation thereunder.''

And by section 9 a tax levy not exceeding one-half mill on the dollar of all property subject to tax is fixed for the payment of the principal and interest of the bonds; and by section 12 the legislature is authorized to provide additional means for the payment of the principal and interest, it being provided that the Act is not exclusive as to the method of payment.

Of the several grounds of attack made against the constitutionality of the Act, in our opinion but one thereof is necessary to be considered determinative of the case: Does the Act contravene the provisions of section 1 of Article XIII of the Constitution, in that it authorizes or purports to authorize the state to give or loan its credit in aid of individuals, or make donations or grants to individuals? That section of our Constitution reads in part as follows: ''Neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association or corporation.'' And section 11 of

Article XII provides in part: "Taxes shall be levied and collected by general laws and for public purposes only."

The provisions of our Constitution are mandatory and prohibitory unless by express words declared to be otherwise. (Section 29, Art. III.)  In approaching a discussion of the [1] constitutionality of the Act in question, we are governed by the axiomatic rule of constitutional law, oft repeated by this court, that the constitutionality of a legislative enactment is *prima facie* presumed, and every intendment in its favor will be made unless its unconstitutionality appears beyond a reasonable doubt. (*Northwestern Mut. Life Ins. Co.* v. *Lewis and Clark County*, 28 Mont. 484, 98 Am. St. Rep. 572, 72 Pac. 982; *In re O'Brien*, 29 Mont. 530, 1 Ann. Cas. 373, 75 Pac. 196; *Spratt* v. *Helena P. & T. Co.*, 37 Mont. 60, 94 Pac. 631; *State ex rel. Peyton* v. *Cunningham*, 39 Mont. 197, 18 Ann. Cas. 705, 103 Pac. 497; *State ex rel. Hay* v. *Alderson*, 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210; *State ex rel. Fenner* v. *Keating*, 53 Mont. 371, 163 Pac. 1156; *State ex rel. Cryderman* v. *Weinrich*, 54 Mont. 390, 170 Pac. 942; *State ex rel. Campbell* v. *Stewart*, 54 Mont. 504, Ann. Cas. 1918D, 1101, 171 Pac. 755; *Gas Products Co.* v. *Rankin*, 63 Mont. 372, 207 Pac. 993.)

The inhibition of the constitutional provisions is, as indi-[2] cated, double in character, being both mandatory and prohibitory, applicable alike to the legislative assembly and the people in their legislative capacity. Irrespective of the determination of other courts, it is our sacred duty to measure the Act by the terms of our constitutional limitations, as we interpret them. "It must be evident to anyone that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility. The legislative and judicial are co-ordinate departments of the government of equal dignity; each is alike supreme in the exercise of its proper functions, and cannot directly or indirectly while acting within the

limits of its authority be subjected to the control or super-
vision of the other without an unwarrantable assumption by
that other of power which, by the Constitution, is not con-
ferred upon it. The Constitution apportions the powers of
governments but it does not make any one of the three depart-
ments subordinate to another when exercising the trust com-
mitted to it. The courts may declare legislative enactments
unconstitutional and void in some cases, but not because the
judicial power is superior in degree or dignity to the legis-
lative. Being required to declare what the law is in the cases
which come before them, they must enforce the Constitution
as the paramount law, whenever a legislative enactment
comes in conflict with it.'' (Cooley on Constitutional Limita-
tions, 6th ed., p. 192.)

With the constitutional restrictions in mind, as well as the
settled rules of interpretation stated, we venture a discussion
of the constitutionality of the Act.

Defendants' position is grounded with explicit candor on
the proposition, clearly indicated by the preamble of the Act,
that the measure is intended to effect the discharge of a
*moral obligation* to recognize the services of Montana sons and
daughters in the World's War by adjusting more or less
roughly the economic adversities suffered in the military
establishment. This involves two propositions for considera-
tion, *viz.*: (1) Does the so-called moral obligation rest on the
state as a political unit? and (2) Assuming that it does, may
it be constitutionally discharged by the Act? A negative
answer to the first question necessarily disposes of the second.
There is and can be no legal obligation to pay for such
services rendered, the war being concluded, and those affected
having returned to peaceful pursuits.

Although the state of Montana, as one of the Union of
states, was naturally interested in the successful outcome of the
war, and it was her duty to do all within her power to pro-
mote the early and successful termination of the struggle;
yet it was the United States which was at war within its
explicitly conferred and independent prerogative, rather than

the state of Montana. With the federal government alone is vested the power to declare war and support an army and navy (sec. 8, Art. I, of the federal Constitution), although the state is required to provide a militia in connection with its internal affairs (Art. XIV, Const. Mont.). Such militia constitutes a state force until actually called into the service of the Union to suppress insurrection, rebellion, or engage in other warfare.

The sovereign power of the United States in the family of [3] nations is vested exclusively in the United States government. Sovereignty in its full sense imports the supreme, absolute, and uncontrollable power by which any independent state is governed; and, although the states of the Union were called sovereign and independent states under the Declaration of Independence, they were never in their individual capacity strictly so, because they were always, in respect to some of the higher powers of sovereignty, subject to the control of a common authority, and were never separately recognized or known as members of the family of nations. (Cooley's Principles of Constitutional Law, Students' ed., p. 16.)   There rests no legal duty on the state to reward those who battled for the preservation of the nation; the legal obligation runs the other way. The individual owes a duty to society to come to the defense of his country in time of war, insurrection, or invasion, whether compensated or not. No civilized nation, and few, if any, of the barbaric countries challenge this principle. The right of the sovereign power to enforce and the duty of the citizen or subject to respond to military service have been repeatedly affirmed, and, what is of greater importance, compelled by the one and performed by the other. As an inherent right for the protection of the fabric of government the sovereign power may compel military service of its subjects even without compensation; but here that question matters not, as all classes now before the court received compensation, and were provided for more bountifully' than any of those in the military service of the other allies during the conduct of the war.

The supreme court of the United States, in *Tarble's Case,* 13 Wall. 397, 408, 20 L. Ed. 597 [see, also, Rose's U. S. Notes], said:

"Among the powers assigned to the national government, is the power 'to raise and support armies,' and the power 'to provide for the government and regulation of the land and naval forces.' The execution of these powers falls within the line of its duties; and its control over the subject is plenary and exclusive. It can determine, without question from any state authority, how the army shall be raised, whether by voluntary enlistment or forced draft, the age at which the soldier shall be received, and the period for which he shall be taken, the compensation he shall be allowed, and the service to which he shall be assigned. And it can provide the rules for the government and regulation of the forces after they are raised, define what shall constitute military offenses, and prescribe their punishment." And, continuing: "No interference with the execution of this ' power of the national government in the formation, organization, and government of its army by any state officials could be permitted without greatly impairing the efficiency, if it did not utterly destroy, this branch of the public service."

The rights of the citizens do not countervail the rights of the nation in the realm of national defense. As was said in *In re Grimley,* 137 U. S. 147, 153, 34 L. Ed. 636, 11 Sup. Ct. Rep. 54, 55: "The government has the right to military services of all of its able-bodied citizens; and may, when emergency arises, justly exact that service from all." And Mr. Justice Harlan, speaking for the supreme court in the case of *Jacobson v. Massachusetts,* 197 U. S. 11, 29, 3 Ann. Cas. 765, 49 L. Ed. 643, 25 Sup. Ct. Rep. 358, 362 [see, also, Rose's U. S. Notes], and referring to the citizen's duty in time of war, said: "He may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense."

"American military law is derived primarily from the Constitution, and comprises besides the provisions of the Constitution on the subject the various statutory provisions relating to the army, including the Articles of War, the Army and Navy Regulations, the various general and special orders issued by the military authorities, and the usages and customs of the service of war." (5 C. J. 296.)

In upholding the constitutionality of the selective service statute (Act May 18, 1917, 40 Stat. 76, 9 Fed. Stats. Ann., 2d ed., 1136 [U. S. Comp. Stats. 1918, U. S. Comp. Stats. Ann., Supp. 1919, secs. 2044a–2044k]), Mr. Chief Justice White, speaking for the court, said: "The proclamation of the President calling the persons designated within the ages described in the statute was made, and the plaintiffs in error, who were in the class and under the statute were obliged to present themselves for registration and subject themselves to the law, failed to do so and were prosecuted under the statute for the penalties for which it provided. They all defended by denying that there had been conferred by the Constitution upon Congress the power to compel military service by a selective draft, and asserted that even if such power had been given by the Constitution to Congress the terms of the particular Act for various reasons caused it to be beyond the power and repugnant to the Constitution. * * *

"The possession of authority to enact the statute must be found in the clauses of the Constitution giving Congress power 'to declare war; * * * to raise and support armies, * * * to make rules for the government and regulation of the land and naval forces.' Article I, sec. 8. And of course the powers conferred by these provisions like all other powers given carry with them as provided by the Constitution the authority to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.' (Article I, sec. 8.)

"As the mind cannot conceive an army without the men to compose it, on the face of the Constitution the objection that it does not give power to provide for such men would

seem to be too frivolous for further notice. It is said, however, that since under the Constitution as originally framed state citizenship was primary and United States citizenship but derivative and dependent thereon, therefore the power conferred upon Congress to raise armies was only coterminous with United States citizenship and could not be exerted so as to cause that citizenship to lose its dependent character and dominate state citizenship. But the proposition simply denies to Congress the power to raise armies which the Constitution gives. That power by the very terms of the Constitution, being delegated, is supreme. Article VI. In truth the contention simply assails the wisdom of the framers of the Constitution in conferring authority on Congress and in not retaining it as it was under the Confederation in the several states. Further, it is said, the right to provide is not denied by calling for volunteer enlistments, but it does not and cannot include the power to exact enforced military duty by the citizen. This however but challenges the existence of all power, for a governmental power which has no sanction to it and which therefore can only be exercised provided the citizen consents to its exertion is in no substantial sense a power. It is argued, however, that although this is abstractly true, it is not concretely so because, as compelled military service is repugnant to a free government and in conflict with all the great guaranties of the Constitution as to individual liberty, it must be assumed that the authority to raise armies was intended to be limited to the right to call an army into existence counting alone upon the willingness of the citizen to do his duty in time of public need, that is, in time of war. But the premise of this proposition is so devoid of foundation that it leaves not even a shadow of ground upon which to base the conclusion. Let us see if this is not at once demonstrable. It may not be doubted that the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need and the right to compel it. Vattel, Law of Nations, book 3, Chapters 1, 2. To do more than state the proposition is

90          State ex rel. Mills *v*. Dixon et al.     [Dec. T. '22

[66 Mont. 76.]

absolutely unnecessary in view of the practical illustration afforded by the almost universal legislation to that effect now in force.'' (Selective Draft Law Cases, 245 U. S. 366, Ann. Cas. 1918B, 856, 62 L. Ed. 349, 38 Sup. Ct. Rep. 159, L. R. A. 1918C, 361.)

Nor can the Act be sustained within the limitations of our [4, 5] Constitution upon the ground that the money authorized to be paid is for a public purpose. Clearly the payment of a bounty to those who served in the military establishment of the United States during the World's War is not a public purpose of the state after the termination of the war, within the purview of the Constitution. The obligation rests primarily on the United States government, if anywhere, to make suitable provision and allowances to those who rendered military service, rather than upon the state as one of the units of the United States. Those who served from Montana served with the army of the United States, rather than of the state of Montana. ''Public purpose'' as used in our Constitution is synonymous with ''governmental purposes.'' (*Board of Councilmen of City of Frankfort* v. *Commonwealth,* 26 Ky. Law Rep. 957, 82 S. W. 1008; *Beach* v. *Bradstreet,* 85 Conn. 344, Ann. Cas. 1913B, 946, 82 Atl. 1030.) There being no legal obligation to pay, it amounts to a mere gratuity or donation, and the expenditure proposed, not being for a governmental purpose, cannot be considered as a public purpose within the purview of the Constitution. Decisions from a number of states have been by us considered and reviewed upholding a cash bonus under somewhat similar constitutional limitations to our own, but we cannot and do not agree to the reasoning or applicability thereof to the provisions of our Constitution. Rather we are impelled to follow and apply the very plain mandates of our constitutional limitations. Some of the cases upon the subject are the following: *State ex rel. Hart* v. *Clausen,* 113 Wash. 570, 13 A. L. R. 580, 194 Pac. 793; *State ex rel. Morris* v. *Handlin,* 38 S. D. 550, 162 N. W. 379; *Veterans' Welfare Board* v. *Riley* (Cal.), 22 A. L. R. 1531, 208 Pac. 678; *State* v. *Johnson,* 170 Wis. 251,

176 N. W. 224; *Gustafson* v. *Rhinow,* 144 Minn. 415, 175 N. W. 903; *Veterans' Welfare Board* v. *Jordan,* 189 Cal. 124, 22 A. L. R. 1515, 208 Pac. 284; *State ex rel. Snyder* v. *Abbey,* 15 Ohio C. C. (n. s.) 261. It is worthy of note that only New York and South Dakota have similar provisions prohibiting gifts or donations to individuals. However, decisions declaring that bounties for past military enlistment or service, where at the time of entering the service there was no offer or promise of a bounty, have been rendered by many of the courts holding them unconstitutional as authorizing an expenditure of public money for a private rather than public purpose. (*Beach* v. *Bradstreet,* 85 Conn. 344, 82 Atl. 1030; *Mead* v. *Acton,* 139 Mass. 341, 1 N. E. 413; *In re Bounties to Veterans,* 186 Mass. 603, 72 N. E. 95; *Opinion of Justices,* 190 Mass. 611, 77 N. E. 820; *Bush* v. *Board of Supervisors of Orange County,* 159 N. Y. 212, 70 Am. St. Rep. 538, 45 L. R. A. 556, 53 N. E. 1121; *Washington County* v. *Berwick,* 56 Pa. St. 466.)

In the case of *Bush* v. *Board of Supervisors of Orange County, supra,* which was a taxpayers' action to restrain the board of supervisors from proceeding to levy a tax upon one of the towns of Orange county in order to pay the claim of certain persons or their heirs who were drafted into the military service of the United States during the Civil War, the court said: "Every government must possess the inherent right or power to call upon its citizens to perform military duty in time of war. The exercise of this power involves the right of self-preservation, and that right in the government imposes upon the citizen a corresponding duty to render such services whenever the emergency arises, and it is demanded of him. The government must necessarily be the judge of the necessity for requiring the performance of this duty. * * * The power to impose taxes, general or local, which rests with the Legislature, is without much express restriction in the Constitution, and yet even this power cannot be said to be absolute. On general principles it has at least one limitation, and that is that the money to be raised

must be required for some purpose that in some sense, at least, can be said to be public. The Legislature cannot authorize taxation for the purpose of making gifts or paying gratuities to private individuals. It is quite clear that this was the purpose of the Act in question.   *   *   *   Those who actually served under the conscription only discharged their obligations to the general government. Those who commuted simply paid so much money in order to be relieved of the obligation to render military service. In either case the individual did nothing more than to discharge his obligations to the government as a citizen, and hence he had no claim against the locality to reimburse him for what he was obliged to do. The fact that a majority of the taxpayers requested the supervisors to levy the tax is of no importance. Majorities, however potent in many respects, have no power to impose taxes upon the minority for the purpose of raising money to be devoted to gifts or gratuities to individuals. We think that, under the general principles which control the exercise of the power of taxation, the Legislature had no power to pass the Act in question. It did not attempt to authorize taxation for any public purpose, but was, in effect, a method of taking private property, not for any public use, but for the benefit of private individuals.''

And in *People* v. *Westchester County National Bank,* 231 N. Y. 465, 15 A. L. R. 1344, 132 N. E. 241, the New York court of appeals held that the issuance by the state of bonds to raise a fund with which to pay a bonus to those who served as soldiers under the federal government was prohibited by a constitutional provision to the effect that the credit of the state should not in any manner be given in aid of an individual. The view expressed by the majority opinion was that the bonus is a gift ''to or in aid of those who had served in the war within the meaning of the constitutional provisions of New York.'' Mr. Justice Andrews, speaking for the majority of the court, in a very lengthy and elaborate opinion, after reviewing many decisions, said in explanation of the court's attitude (to which we subscribe in the main):

"Under these decisions is the bonus to our soldiers and sailors the payment of an obligation due them from the state? This is the ultimate question. Upon its answer depends the validity of the Act of 1920. It is so conceded in one of the dissenting opinions, and in discussing it we do not ignore the splendid services and the great patriotism not only of the American Expeditionary Forces, but of those who remained on this side of the sea. We do not forget the love and admiration that they have won and the gratitude that is theirs. We know that when the United States declared war it declared it for the whole country; that the government of the state and the government of the United States were equally interested in victory; that while serving the United States our soldiers and sailors were also protecting New York. We were all vitally interested in the war. Defeat spelled unspeakable calamity. Yet the men who gained the victory were not in any respect servants of the state. It did not call them from their homes or lead them to battle. It did nothing. It exercised no authority. It is said that our soldiers were taken from homes and occupations and compelled to risk their lives for inadequate pay while others earned large wages in safety; that the statute attempts, in a small way, to distribute more fairly the public burden. It is all true, but again the state was not the actor. Neither it nor its servants injured anyone. It received no property for which it has not paid. Nor were services rendered to it in any sense that services were not rendered to every city in the land. That services rendered the United States incidentally benefited every state is no foundation for a claim of obligation, however great the gratitude due. Gratitude may impel an individual to reward his benefactor. One may do as he will with his own. The state of New York may not. Its Constitution forbids. It may not attempt to equalize among its citizens inequalities caused by federal legislation. For that equalization resort must be had to the federal government. And the federal government recognizes the claim. It intends to discharge the obligation as its own.  *  *  *  This proposition receives popular approval.

It is not forbidden by our national Constitution. Thus and thus only can every one, in whatever state he may reside, receive an equal reward for equal services. And when the time comes for this distribution, New York, as a part of the United States, will bear a very large proportion of the total expense involved. So it will aid in repaying the moral obligation which is due from the country to its defenders. But under this Act it will bear a double burden. Its citizens will pay twice—once for the state, once for the nation. * * * Did the majority favor the Act because they believed they were discharging an obligation? Or was their vote a testimony of their gratitude? We are told that similar statutes have been passed elsewhere. So we have already said. It is one thing, however, to quote such practices as illustrating those fundamental principles common to free governments as we have quoted them. It is another to use them as defining the distinction between a gift and the payment of an obligation necessitated by the language of our Constitution. Such decisions as have been made show the danger of such a course.''

It being clear that beneficiaries under the Act have no legal [6] claim for services rendered, will the so-called moral obligation to appreciate and express appreciation by a money payment suffice to justify the legislation? The answer must be in the negative. However pressing or persuading the reasons for fulfillment of moral obligations—and a great number of our citizens have recorded their conviction that the instant case presents a moral obligation of the most primary character —the fulfillment of such obligation here involves a purely voluntary grant, in short, a gift or gratuity, to one class of individuals. And it is well-settled law that the public money cannot be used to pay a gratuity to an individual when he is without legal claim to the money, and when it cannot fairly be said that the public good will be served by such payment. (26 R. C. L., p. 63.) Desirable though it might be to sanction recognition and enforcement of these moral obligations, our jurisprudence has not attained that end. It knows only the obligation whose discharge may be compelled by legal action.

The discharge of this so-called obligation may not be com-
pelled, either because military service may be secured with
no duty to compensate or because compensation, in the legal
sense, has already been effected. Certainly if there was any
legal claim to additional compensation for members of the
military establishment now returned to civil pursuits, it would
have been heard long before this; and yet no such instance
is brought to our attention, nor have we found any.

In our opinion that which may be compelled by authority
of law contains no element of gratuity; that which may not be
thus realized comes, if at all, as a gratuity. There is no
middle class or species, and, when the state is required to lend
its credit in behalf of that gratuity, as here, the Constitution
is violated. (*People* v. *Westchester County Nat. Bank, supra.*)
The language is plain: "Neither the state, nor any county
*   *   * of the state shall ever give or loan its credit in aid
of, or make any donation or grant, by subsidy or otherwise,
to any individual.  *   *   *   * "

The meaning of the section is as clear and comprehensive
as language can be. Nor is its force cut down by historical
association with the effort to curb railroad subsidies, for these
are specially prohibited by section 38 of the Bill of Rights
(Article V of the Constitution).

This result is not disturbed by calling the payment "ad-
justed compensation" on the assumption that it rectifies
economic disparities between the wartime pay of the veteran
and his civilian coworker mobilized behind the battle lines.
It is, of course, perfectly patent that the $10 per month fixed
by the Act, with maximum of $200 for service of any length,
will hardly begin, when added to the monthly pay and allow-
ances of an overseas private, say $33, to cut down or narrow
the disparity in favor of the $300 per month shipworker. The
government might legally, and it is generally conceded now
should, have impressed civilian workers on the same basis as
soldiers, but the failure so to do serves only as argument when
equalization depends wholly on the voluntary action of the
government. The wrong then perpetrated furnishes no right

now, or, to put the matter another way, will not remove the constitutional prohibition against gratuities to any individual heretofore a member of the military establishment on the basis of equalization of compensation with the overpaid class. The words "adjusted compensation" are a misnomer where there is no compensation due, in the legal sense of enforceable compensation.

The former decisions of this court cited by counsel do not support their contention respecting the constitutionality of the Act in question. In *State ex rel. Casteel* v. *State Board of Examiners,* 56 Mont. 621, 190 Pac. 1117, the Act under consideration was purely "for the assistance, aid and encouragement of soldiers *of the United States,* going to and returning from the war *in which the United States is fighting Germany* and her allies." So, too, the case of *State ex rel. Campbell* v. *Stewart,* 54 Mont. 504, Ann. Cas. 1918D, 1101, 171 Pac. 755, dealt with an appropriation of money "to be expended by the Montana council of defense in aiding and assisting the United States in the carrying on and prosecuting of the *war now existing between the United States* and the German and Austrian Empires," and Mr. Justice Sanner, speaking for this court, well said: "The purpose of the Act, as apparent on its face and as emphasized in section 14, is the most public one that could well be imagined. (*City of Lowell* v. *Oliver,* 8 Allen (Mass.), 247; *Freeland* v. *Hastings,* 10 Allen (Mass.), 570; *Franklin* v. *State Board of Examiners,* 23 Cal. 173; *People* v. *Pacheco,* 27 Cal. 175.) The United States is at war, and to assist the United States in war is expressly recognized by the Constitution as a proper and probable occasion for the use of state funds. (Const., Art. XII, sec. 12.) Moreover, this state, as one of the United States, is at war; when aiding the United States, this state but defends itself, and thus exercises the highest attribute, as it observes the most solemn duty, of sovereignty. That in pursuing this public purpose the state, through its legislature, may adopt or prescribe any mode or means reasonably adapted to accomplish such purpose is too well settled for debate. And if it be true that an 'army

travels on its stomach,' then to enlarge the food production, as this Act designs, is as essential and important an aid to war as the furnishing of munitions or the equipping of men. The events of the past three years, as of all previous history, bear eloquent testimony to the vast, if not paramount, importance of food production, not only for armies but for the people behind the armies, as a measure of war; and though in the last analysis such production harks back to the 'individual, association or corporation,' and though, to stimulate such production, either gifts or loans are employed, the outstanding and controlling public purpose is the end that justifies and validates the means." (Cases cited.)

This language of Justice Sanner clearly shows that the Act under consideration was a war measure, and we indorse all said by him above quoted, except that the state as one of the United States was at war. This language was employed by the learned Justice merely as a figure of speech; but, to be plain and consistent with the views herein expressed, it would have been more accurate to have said: "The United States as a sovereign power is at war, the state of Montana being merely one of its several units, and naturally vitally interested in the outcome."

In *In re Pomeroy's Estate*, 51 Mont. 119, 151 Pac 333, plaintiff's contention is in no manner sustained. The state legislature by Act of 1913 (Chapter 132, Laws 1913) passed an enabling Act whereby as to escheated property or property alleged to have escheated, paid into the state treasury of the state of Montana, a rightful heir might, within the period limited in the Act, recover from the state the amount to which he was entitled as an heir; and the court simply held in the above case that, wherever there is a right such as that existing in the heir to property alleged to have been escheated, the legislature is not prohibited by the Constitution from providing a remedy. The state, under the facts, was said to have held the property as an involuntary trustee for the benefit of the heir. There the right existed independent of the statute, which merely afforded a remedy.

This case, like others comprehending constitutional questions [7] of great magnitude, develops much by way of argument which is properly addressed to the people at large, or to a constitutional convention, or, within conceivable limits, to the legislative assembly. As a court dealing with the validity of the enactment after the fact, our sole consideration is one of law whether the measure is within the provisions of the Constitution of Montana which the people have set over themselves and all their governmental agencies. With the wisdom, policy or expediency of the statute we are not concerned. (*Godbe* v. *McCormick*, 1 Mont. 105; *Jay* v. *School District*, 24 Mont. 219, 61 Pac. 250.)

Be it in accord with the elementary principles of justice or opposed to more or less accepted notions of public gratitude, the Constitution must prevail. We feel the more secure in our determination when we remember that the beneficiaries of the Act themselves recorded one of the most whole-hearted examples of obedience to constitutional government which the history of the United States affords when, in 1917 and 1918, they went forth strong and true to their country's call. By the magnificent and enduring qualities of their deeds and service, they brought imperishable honor to the American arms in the trenches and forests of France, on the fields of Flanders, on the summits of the Alps, in the snowy wastes of the Murmansk coast, on the banks of Lake Baikal, along the dreary stretches of the Amur river in Siberia, and on the high seas. For this they now have the everlasting love and gratitude of their own countrymen and of their allies in arms, that which is eternal compensation.

Were the members of this court to sanction a violation of the fundamental law, no matter how overwhelming the public sentiment therefor, or however justifiable on nonlegal grounds, it would expect first and severe rebuke from those who but lately exemplified their submission and devotion to constitutional authority at the risk of life itself.

It must be plain that the Act in question, if upheld by this court as constitutional, would afford but little and only tem-

porary relief in individual cases.  The author of this opinion is himself an ex-service man, having served several months in camps in this country and with the A. E. F. Siberia overseas for one year.  His sympathies and those of each and all of his colleagues are with the ex-service man and woman; but, were we to do otherwise than declare this Act unconstitutional, we should be derelict in the performance of our duty, recreant to our trust, and forfeit our self-respect.

Let the writ issue.

Mr. Chief Justice Callaway and Associate Justices Cooper, Holloway and Stark concur.

## On Motions for Rehearing.

(Decided March 5, 1923.)

Mr. Justice Galen delivered the opinion of the court.

By the term "legal claim" as used in the opinion is meant **[8]** such as is warranted in the law, or previously authorized by law.  Compensation or the payment of any claim against the state not previously authorized by law is prohibited in express terms of our Constitution.  (Sec. 29 of Article V.)

Counsel insist that the decision herein is contrary to the views heretofore expressed by this court in the cases of *State ex rel. Campbell* v. *Stewart*, 54 Mont. 504, Ann. Cas. 1918D, 1101, 171 Pac. 755, and *State ex rel. Casteel* v. *State Board of Examiners*, 56 Mont. 621, 190 Pac. 1117; but this is not so, both of the Acts under consideration in those cases having been in aid of the United States in the successful prosecution of the war against Germany and her allies.  But it is argued that the Act under consideration in the *Casteel Case* was approved March 4, 1919, long after the armistice (November 11, 1918), and that therefore it is in the same category as referendum measure No. 25 herein considered.  This contention would be meritorious had the war been ended on March 4, 1919.  The

[9]  armistice did not conclude the war; it amounted merely to a cessation of hostilities; and the war was not terminated between the United States and Germany until July 2, 1921. (Stats U. S. 1st Sess. 67th Cong. 1921, "Treaties and Conventions," p. 117.)  The Act in question was not proclaimed a law until December 15, 1922, long after the war was over.

The motions for a rehearing are denied.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, HOLLOWAY and STARK concur.