No. 13069

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

BOARD OF REGENTS OF HIGHER EDUCATION OF
THE STATE OF MONTANA,

Plaintiff,

-vs-

THOMAS L. JUDGE, Governor of the State
of Montana,

Defendant,

and

LEGISLATIVE FINANCE COMMITTEE OF THE
MONTANA LEGISLATIVE ASSEMBLY,

Intervenors.

---

ORIGINAL PROCEEDING:

Counsel of Record:

For Plaintiff:

Datsopoulos and MacDonald
Milton Datsopoulos argued, Missoula, Montana

For Defendant:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
John P. Atkins argued, Assistant Attorney General,
Helena, Montana
Lon J. Maxwell argued, Assistant Attorney General,
Helena, Montana

For Intervenors:

John W. Northey argued, Helena, Montana

For Intervenors Amicus Curiae:

Berg, Angel, Andriolo and Morgan, Helena, Montana
Gregory O. Morgan argued, Bozeman, Montana

---

Submitted: September 10, 1975

Decided: DEC 19 1975

Filed: DEC 19 1975

Thomas J. Kearney
Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an original proceeding for a declaratory judgment brought by the Board of Regents of Higher Education of the State of Montana against the Governor of the State. The Board of Regents seeks definitive rulings on the constitutionality of two bills passed during the 1975 legislative session and signed into law by the Governor. House Bill 271 appropriates monies to the university system for the biennium. Senate Bill 401 provides for a legislative finance committee to approve budget amendments. More will be said about these two bills later in this opinion.

The Board of Regents, hereinafter referred to as the Regents, sought original jurisdiction in this Court. This Court set the matter for adversary hearing. Hearing was had. Defendant Governor, hereinafter referred to as Governor, moved to dismiss on procedural grounds. The motion was denied. The Legislative Finance Committee and the Legislative Audit Committee of the Montana Legislative Assembly moved to intervene. Hereinafter these committees will be referred to in the singular as the Finance Committee. Such intervention was granted, and no challenge is made to the status of legislative committees as party litigants. The Associated Students of Montana State University and University of Montana were allowed to submit a brief and appear as amicus curiae.

By order this Court accepted original jurisdiction on the basis of the emergency nature of the controversy and set a prehearing conference pursuant to Rule 28, M.R.App.Civ.P., to consider simplification of the issues. Thereafter the Court directed the Governor and his agents to refrain from withholding payments on claims and warrants by the university system until further order of this Court.

Following the prehearing conference this Court ordered in part:

"I. The Forty-Fourth Legislature of the State of Montana passed House Bill 271 which purports to appropriate money to the University System for the biennium. During the same session, the Legislature passed Senate Bill 401 which provides for a legislative finance committee to approve budget amendments. Pursuant to House Bill 271, the budget director declared the appropriation to the University System void in the absence of a letter certifying compliance with the provisions of the bill. The Board of Regents declined to certify and brought this action for disposition of the issues involved.

"II. The issues to be resolved in this action are as follows: 1) whether Section 1(3) of House Bill 271, in light of the provisions of Senate Bill 401 is an unconstitutional infringement on the powers and duties of the Board of Regents; 2) whether (a) the certification requirement contained in the origination clause of Section 12 of House Bill 271 is unconstitutional as an improper legislative infringement on the management authority of the Board of Regents, and (b) whether Section 12(6) of House Bill 271 is unconstitutional as a direct invasion of the management prerogatives granted to the Board of Regents by Article X, Section 9 of the Montana Constitution."

The pertinent parts of the two enactments are:

HOUSE BILL 271.

"Section 1. For the purposes of this act, unless otherwise stated:

" * * *

"(3) 'Approved budget amendment' means approval by the board of regents unless otherwise provided by law, of a request to:

"(a) obtain financing for new or expanded programs from funds which were not available for consideration by the legislature but which have become available from a source other than the state's general fund; or

"(b) transfer not more than fifteen percent (15%) of any single university system unit's appropriations, including general fund appropriation between units and transfer appropriations between programs within a university system unit; or

"(c) expend remaining balances of the first fiscal year of the biennial appropriations, including general fund appropriations, during the second fiscal

- 3 -

year of the biennium.

" * * *

"Section 12. The provisions set forth in this section are limitations on the appropriations made in this act. It is the purpose of the legislature in enacting this bill only to appropriate funds and to restrict and limit by its provisions the amount and conditions under which the appropriations can be expended. Except as otherwise provided in this act, the expenditures of appropriations are hereby contingent upon the board of regents certifying to the budget director that the university units shall comply completely with the following general and specific provisions: * * *

"(4) All moneys collected or received by university system units subject to this act from any source whatsoever, including federal grants for research and operations, and any moneys received from a foundation shall be deposited in state treasury pursuant to the provisions of Title 79, R.C.M. 1947, except that the department of administration may, pursuant to section 79-603, R.C.M. 1947, permit any university system unit subject to this act to retain in its possession moneys that would otherwise be deposited in the state treasury, provided that the anonymity of private foundation donors shall be maintained and that private donations shall not be used as an offset to general fund appropriations.

" * * *

"(6) Salary increases for presidents of units of the university system and for the commissioner of higher education shall not exceed five percent (5%) each year of the biennium using the respective fiscal year 74-75 salaries previously approved by the regents as the basis for determining such increases.

"In the absence of such certification of compliance, the appropriations in this act are null and void.

"The regents shall grant classified university employees salaries in accord with House Joint Resolution, 37, forty-fourth legislature." (Emphasis supplied.)

House Bill 271 was amended by the Forty-Fourth Legislature in its

House Bill No. 1 (Special Session) by adding Section 13 to H.B. 271:

"Section 13. In addition to the appropriations contained in this act, all other monies received from sources other than the general fund and which were not available for consideration by the legislature are hereby appropriated. Such monies may be made available for expenditure only

by a budget amendment approved by the legislative finance committee."

SENATE BILL 401:

"Section 1. * * * Definitions.  In this act: * * *

"(2)  'Budget amendment' means a request submitted through the budget director to the committee for executive branch agencies to expend funds in excess of those appropriated by the legislature.

"Section 2. * * * Approval of budget amendments. All budget amendments for state agencies must be submitted through the budget director to the committee.  No state agency shall expend in excess of the appropriation except under authority of a budget amendment approved by the committee.  The committee shall approve, with or without modification, or disapprove, each proposed budget amendment of any state agency."

The Governor does not oppose the Regents with respect to the legislative budget process put forth in Issue No. 1, but see Governor's stand in companion case, Cause No. 13201, Governor v. Legislative Finance Committee).  The Finance Committee does oppose the Regents with respect to the legislative budget process in Issue No. 1.  Amicus Curiae support the Regents.

Prior to discussing Issue No. 1, it will be helpful to give some background.  House Bill 271 appropriates money to the university system for the biennium by various line items from various state operating funds.  The Commissioner of Higher Education, the University of Montana, Montana State University, and the various other college units are each appropriated certain funds.

For example, the University of Montana is appropriated $17,782,106.00 for the year ending June 30, 1976, in ten line items:

```
Instruction..................................10,114,000
Research.......................................176,768
Public Service.................................131,718
Academic Support.............................1,737,215
Student Services...............................886,183
Institutional support........................1,730,230
Operation & maintenance of plant...........1,941,316
Forest Experiment Station......................241,591
Scholarships and fellowships...................525,000
Malmstrom Air Force Base instruction...........298,085
                                 Total      17,782,106
```

```
From the general fund.....................9,808,239
From the earmarked revenue fund
   02106 University millage  ERA..........3,041,786
02650 U.M. Student fee ERA................4,336,999

From the federal and private revenue
   fund

   04308 UM interest and income FPRA.........75,000
   04515 UM federal program FPRA............346,944
   Social Rehabilitation Services transfer..173,138

                              Total       17,782,106
```

H.B. 271 provides for budget amendment by the Regents whenever funds become available from sources outside the general fund for new or expanded programs, or in transfers of not more than 15% of any appropriation of a single unit of the university system to another unit, and expending balances remaining at the end of the first fiscal year during the second fiscal year.

Additional monies are appropriated by section 3 of H.B. 1, (Special Session) Laws of 1975, which adds an additional section to H.B. 271, Section 13 as previously quoted. The contigency of additional appropriations by budget amendments is taken from the Regents by definition in H.B. 271, Section 1 (3), "'Approved budget amendment' means approval by the board of regents unless otherwise provided by law * * *." (Emphasis supplied.)

S.B. 401 provides that no state agency shall expend in excess of an appropriation except under authority of a budget amendment approved by the legislative finance committee. Thus both by the section 13 amendment in the Special Session to H.B. 271 and by S.B. 401, the authority for budget amendments is in the legislative finance committee.

Thus, the question and conflict arises between the Regents and the legislative finance committee.

The Regents urge that line item appropriations of general fund monies by the legislature to the Board of Regents infringe on the authority of the Board granted by the Constitution of Montana

1972. Their position is hinged on this language contained in Article X, Section 9, 1972 Montana Constitution:

> "(2)(a)  The government and control of the Montana university system is vested in a board of regents of higher education which shall have full power, responsibility, and authority to supervise, coordinate, manage and control the Montana university system * * *."  (Emphasis supplied.)

The Regents in part state their position:

> "This provision [Article X, Section 9(2)(a)] clearly indicates the broad scope of authority vested by the framers in the Board of Regents. The grant of power is clear and unambiguous. * * * Given their plain meaning, the words * * * grant a high degree of autonomy to the Board of Regents."

During oral argument, in response to a question from the bench, counsel went so far as to state that indeed the university system and its Board of Regents was a fourth branch of government.  In support of that construction, the Regents note particular changes in the 1972 constitutional provision which, they insist, are indicative of the intent of the framers to vest complete control in the Regents to the exclusion of legislative and executive bodies.

First, the 1889 Constitution vested control and supervision in the state board of education, but limited its powers to those which "shall be prescribed and regulated by law.", Art. XI, Sec. 11.  Thus, the Regents urge that a board regulated by law is clearly under the control of the law-making body to some extent. The qualifying phrase is absent in the 1972 Montana Constitution, indicating that the powers of the Regents are not to be prescribed by the legislature.  Second, the language of the new provision is much stronger and more comprehensive than that of the old provision. Under the 1889 Constitution, the board of education was given "general control and supervision" of the university system; under the 1972 Montana Constitution, the Board of Regents was given "full power, responsibility and authority to supervise, coordinate, manage and control the Montana university system * * *."

- 7 -

At this point we observe that if Article X, Section 9, 1972 Montana Constitution, was read literally without reference to the rest of the Constitution, the Regents argument and position would be correct; but, as will be hereinafter developed, the Constitution is not so read.

Article III, Section 1, 1972 Montana Constitution, reads:

> "The power of the government of this state is divided into three distinct branches - legislative, executive, and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted. (Emphasis supplied.)

Article V, Section 1, 1972 Montana Constitution, reads:

> "The legislative power is vested in a legislature consisting of a senate and house of representatives. The people reserve to themselves the powers of initiative and referendum." (Emphasis supplied.)

Article VIII, Section 12, 1972 Montana Constitution, reads:

> "The legislature shall by law insure strict accountability of all revenue received and money spent by the state, and counties, cities, towns, and all other local government entities." (Emphasis supplied.)

It is the opinion of this Court that these provisions of the 1972 Montana Constitution and Article X, Section 9, should stand together. To be sure, that constitutional provision, like most, is couched in broad language, but it must not be read or construed in isolation. To aid our analysis of this section we rely on several rules of construction used previously by this Court.

First, Arps v. State Highway Commission, 90 Mont. 152, 160, 300 P. 549, provides:

> " * * * the Constitution must receive a broad and liberal interpretation consistent with the purpose of the framers and the people in adopting it, that it may serve the needs of a growing state; 'the

proper interpretation of any constitutional pro-
vision requires us to remember that it is a part
of the organic law--organic not only in the sense
that it is fundamental, but also in the sense that
it is a living thing designed to meet the needs of
a progressive society, amid all the detail changes
to which a progressive society is subject.' (State
ex rel. Fenner v. Keating, 53 Mont. 371, 163 Pac.
1156, 1158.)"

Next, this rule stated in Cottingham v. State Board of

Examiners, 134 Mont. 1, 11, 17, 328 P.2d 907:

"It has also frequently been stated that the
Montana Constitution, unlike the Constitution
of our United States, is a prohibition upon legis-
lative power, rather than a grant of power.
[Citing cases]"

Also valuable are these rules from Cottingham:

"'A Constitution, or provisions thereof, should
receive a reasonable and practical interpretation
in accord with common sense.' 16 C.J.S. Consti-
tutional Law, section 14, pp. 66, 69. * * *

"All of the provisions of the Constitution bearing
upon the same subject matter are to receive appro-
priate attention and be construed together."
(Emphasis supplied.)

Since our construction will determine the validity or

invalidity of legislative acts, citing the presumption of con-

stitutionality and burden on the party seeking to overcome the

presumption stated in State ex rel. Mills v. Dixon, 66 Mont. 76,

84, 213 P. 227, is also appropriate:

" * * * the constitutionality of a legislative
enactment is prima facie presumed, and every intend-
ment in its favor will be made unless its unconstitu-
tionality appears beyond a reasonable doubt."

Our task then is to harmonize in a practical manner the

constitutional power of the legislature to appropriate with the

constitutional power of the Regents to supervise, coordinate,

manage and control the university system. At the outset we note

that there is not always a clear distinction between these powers

and therefore limit our ruling here to these specific legis-

lative enactments.

It is also necessary when speaking to issues arising

out of the appropriation process to clarify our conception of the funds subject to that power. Previous rulings of this Court have limited the scope of appropriation to the general fund. State ex rel. Bonner v. Dixon, 59 Mont. 58, 76, 195 P. 841; State Aeronautics Commission v. Board of Examiners, 121 Mont. 402, 410, 194 P.2d 633, and cases cited therein. Statutory changes, as well as the 1972 Montana Constitution, cause us to reexamine that definition at this time.

In 1963 the legislature enacted the "Treasury Fund Structure Act", section 79-409, R.C.M. 1947, with a purpose:

> " * * * to make possible the full utilization of modern accounting methods, to provide the legislative assembly with a greater measure of control over public moneys, and to enable the financial records of the state to accurately reflect governmental costs and revenues." (Emphasis added.)

We note here that the structure of the 1972 Constitutional provisions have changed to a considerable extent the connotation to be placed on the word "control" as used in section 79-409.

Section 79-410 of the Act provides for these funds in the state treasury: 1) General fund. 2) Earmarked revenue fund. 3) Sinking fund. 4) Federal and private revenue fund. 5) Federal and private grant clearance fund. 6) Bond proceeds and insurance clearance fund. 7) Revolving fund. 8) Trust and legacy fund. 9) Agency fund.

Then section 79-415 states in part:

> "(1) Moneys deposited in the general fund, the earmarked revenue fund, and the federal and private revenue fund, with the exception of trust income and refunds authorized in subsection (3) of this act, shall be paid out of the treasury only on appropriation made by law. * * *" (Emphasis supplied.)

The 1972 Constitution also broadens the scope of the appropriation power. Article VI, Section 9, commands the governor to submit a budget to the legislature "setting forth in detail for all operating funds the proposed expenditures and estimated

revenue of the state".   (Emphasis supplied.)

Article VIII, Section 9, 1972 Montana Constitution

states:

"Appropriations by the legislature shall not
exceed anticipated revenue."

Section 12 of the same Article provides:

"The legislature shall by law insure strict
accountability of all revenue received and money
spent by the state, and counties, cities, towns,
and all other local governmental entities."
(Emphasis added.)

Thus the legislative appropriation power now extends

beyond the general fund and encompasses all those public operating

funds of state government.   Prior to the 1972 Constitution, the

Treasury Fund Structure Act, sections 79-409 through 79-416,

R.C.M. 1947, provided for the nine funds heretofore listed.

However we emphasize that the power to appropriate does

not extend to private funds received by state government which

are restricted by law, trust agreement or contract.   Accordingly,

we limit subsection (4) of section 79-410 which provides:

"(4)   Federal and private revenue fund.   The
federal and private revenue fund consists of all
expendable moneys deposited in the state treasury
from federal or private sources, including trust
income, which are to be used for the operation
of state government."   (Emphasis supplied.)

This provision, in view of our conception of the appropriation

power, cannot be used as a basis for legislative control over

expenditures of the types of private moneys enumerated above and

is invalid to the extent it may be so read.   Similarly, the gen-

eral appropriation contained in H.B. 1 (Special Session) is also

limited to the public operating funds of state government.

An example of such a fund outside the appropriation pro-

cess was the Montana Trust and Legacy Fund established by Article

XXI, 1889 Montana Constitution.   Therefore, to the extent they

are inconsistent with this discussion of the legislature's power

to appropriate, our earlier rulings in State ex rel. Bonner v.
Dixon, supra, and State Aernautics Commission v. Board of
Examiners, supra., are overruled.

These funds--subject to the appropriation process--
concern us in the Regents' challenge to the approved budget
amendment requirement of Section 1 (3) of H.B. 271. If the
approval of budget amendments by the Finance Committee is a proper
exercise of the legislative appropriation power, then the Regents
as part of state government are subject to those requirements.
But, as developed in this Court's opinion in the companion case,
State ex rel. Thomas L. Judge v. Legislative Finance Committee,
Cause #13201, also decided today, the power to approve budget
amendments in S.B. 401 constitutes an unconstitutional delegation
of legislative power to the Finance Committee. Thus for the
reasons enumerated in that opinion, the Regents' challenge to
the approved budget amendment requirement of H.B. 271 succeeds.

To reach the Regents' constitutional challenge of the
certification requirement in the origination clause of Section
12 of H.B. 271, we must consider the power of the legislature to
make line item appropriations.

We repeat the provision of H.B. 271:

> "Section 12. The provisions set forth in this
> section are limitations on the appropriations
> made in this act. It is the purpose of the
> legislature in enacting this bill only to
> appropriate funds and to restrict and limit by
> its provisions the amount and conditions under
> which the appropriations can be expended.
> Except as otherwise provided in this act, the
> expenditures of appropriations are hereby
> contingent upon the board of regents certifying
> to the budget director that the university units
> shall comply completely with the following general
> and specific provisions * * *." (Emphasis
> supplied.)

If the legislature cannot make line item appropriations
for the university system, it does not have the authority to re-
quire certification by the Regents. The position of Amicus, which

was adopted by the Regents in oral argument, is that the "autonomy" and "uniqueness" of the Regents precludes line item appropriations by the legislature. However, we find no constitutional limitations or judicial interpretation of this Court to bottom such a conclusion. The Regents' assertion of autonomy based on an isolated analysis of one article of Montana's Constitution does not show a basic violation of fundamental law of this long standing legislative practice. Even the Regents' cases from other jurisdictions cited in support of this principle, two of which we discuss later, do not challenge the authority of the legislature to itemize appropriations.

An early Michigan case, Sterling v. Regents of the University of Michigan, 110 Mich. 369, 68 N.W. 253, 257, sets the precedent for regent autonomy according to the Regents, but this Court notes this discussion in the decision which illuminates the background of the constitutional provision giving the regents control over "expenditures from the university interest fund" (similar to the Montana Trust and Legacy Fund, Article XXI, 1889 Constitution):

> "It is significant that, at the time of the adoption of the constitution, this fund constituted the sole support of the university, aside from fees which might be received from students. The state had made no appropriations for its support and there is nothing to indicate that any such appropriations were contemplated." (Emphasis supplied.)

The present Michigan Constitution grants the regents control of "expenditures from the institution's funds." Based on this provision regent autonomy recently prevailed over these legislative appropriation bills described in Regents of University of Michigan v. The State of Michigan, 47 Mich.App. 23, 208 N.W.2d 871, 874-875:

> "Furthermore a careful reading of 1972 P.A. 260 discloses that the Legislature has in no way abandoned

- 13 -

> its intention to substitute its judgment for that
> of the constitutionally created boards of control
> * * *.
>
> "Whether it be under the guise of the police power
> or a reporting requirement, the simple fact remains
> that the legislature still is attempting through
> 1972 P.A. 260 to do the same thing it sought to do
> through 1971 P.A. 122 and prior acts:  i.e., deter-
> mine who shall teach and who shall not, who shall
> learn and who shall not."  (Emphasis supplied.)

Regent autonomy has not been asserted over the bare legislative power to appropriate in the above instances.  That power, by implication in these cases and expressly in others cited by the Regents, is secure even in Michigan with its strong constitutional provision and long judicial recognition of autonomy of the regents.  We recognize here that while Montana's Constitution is not as explicit or broad as that of Michigan, the principle of regent independence was definitely intended by the drafters of the 1972 Montana Constitution.  At the same time, just as in Michigan, legislative control of higher education through the appropriation process remains.  The Regents are a constitutional body in Montana government subject to the power to appropriate and the public policy of this state.  For a discussion of the impact of the 1972 constitutional provision see:  Schaefer, The Legal Status of the Montana University System under the New Montana Constitution, 35 Mont. Law Review 189.

Going hand in hand with the power to appropriate has been legislative exercise of control over expenditures through itemization.  Historically the English Parliament during the reign of William in the seventeenth century appropriated sums for particular purposes with penalties for disobedience.  See 4 Thomson, A Constitutional History of England - 1642-1801, p. 206.  After two years of lump sum appropriations the United States Congress in 1793 began to itemize expenditures in its appropriation acts.  Act of February 28, 1793, Ch. 18, §1, 1 Stat. 325.  In Montana too,

itemization of appropriations is well established. Laws of Montana, Second Session 1891, pp. 129, 130. In addition to these historical bases, itemization of appropriations is vital to the legislative decision-making process involved in providing a balanced budget (Article VIII, Section 9), in providing a system of strict accountability (Article VIII, Section 12), and in fulfilling the audit responsibility of Article V, Section 10. Also, Article X, Section 9(1) provides that:

> "It [state board of education] shall submit unified budget requests."

These constitutional bases justify the legislature's use of line items in its appropriations.

However, the legislature cannot do indirectly through the means of line item appropriations and conditions what is impermissible for it to do directly. Line item appropriations become constitutionally impermissible when the authority of the Regents to supervise, coordinate, manage and control the university system is infringed by legislative control over expenditures. On their face, the budget items and corresponding line items of H.B. 271 are reasonably related to the purpose of providing funds for necessary services and the other responsibilities of the legislature enumerated above.

Within these parameters we now consider the certification requirements of Section 12, House Bill 271.

That section, as previously quoted, requires the Regents to certify full compliance to certain conditions to the budget director. Without such certification of compliance the appropriations in the bill are null and void. At the same time the Regents concede that the conditioning of appropriations has been a traditional and recognized legislative prerogative. Despite this, the Regents contend that compliance with numerous conditions erodes their authority granted them by the Constitution. But,

the Regents' argument sheds little light on specific intrusions; hence our ruling here is necessarily limited due to the facts presented us.

We think this description adopted by Minnesota in State ex rel. U. of Minnesota v. Chase, 175 Minn. 259, 220 N.W. 951, 955 to be a realistic approach to the issue of the propriety of legislative conditions to university system appropriations:

> " * * * At the one extreme, the Legislature has no power to make effective, in the form of a law, a mere direction of academic policy or administration. At the other extreme it has the undoubted right within reason to condition appropriations as it sees fit. 'In such case the regents may accept or reject such appropriation. * * * If they accept, the conditions are binding upon them.'" (Emphasis supplied.)

As noted above, the Regents are not mentioned in either Article III, Section 1, which creates the three branches of government, nor in Article V, which limits the powers of the legislature. Similarly, the legislature is not mentioned in Article X, Section 9(2), which entrusts the government and control of the university system to the Regents. By no rule of construction then can the powers of one be exercised or encroached upon by the other. In other words, the conditioning of university system appropriations by the 1975 Montana legislature and the summary procedure for compliance were proper exercises of its appropriation powers to the extent the conditions do not infringe on the constitutional powers granted the Regents. This means the conditions must be individually scrutinized to determine their propriety. The fact that there are numerous conditions and a requirement of blanket compliance does not in itself infringe upon the Regents' constitutional powers.

Nevertheless we cannot neglect the fact that certain of the certification requirements do exceed the limits to the exercise of the appropriation power which we have outlined above.

We note particularly these provisions of Section 12, H.B. 271:

> "(4) All moneys collected or received by university system units subject to this act from any source whatsoever, including federal grants for research and operations, and any moneys received from a foundation shall be deposited in the state treasury pursuant to the provisions of Title 79 R.C.M. 1947, except that the department of administration may, pursuant to section 79-603, R.C.M. 1947, permit any university system unit subject to this act to retain in its possession moneys that would otherwise be deposited in the state treasury, provided that the anonymity of private foundation donors shall be maintained and that private donations shall not be used as an offset to general fund appropriations."
> (Emphasis supplied.)

Based on our earlier discussion of the legislative appropriation power, certification cannot be used as a bootstrapping device to gain legislative control over private moneys. As noted heretofore, private moneys restricted by law, trust agreement, or contract are beyond the appropriation power. To the extent then that the certification requirement of Section 12(4) attempts to exert any control over such private moneys or to grant any discretion over such funds to the department of administration, it is unconstitutional.

The Regents' challenge to Section 12(6) of House Bill 271 on its face, in the final issue presented to this Court, provides us an opportunity to more fully define the limits within which the legislature may condition appropriations to the university system. That section provides:

> "(6) Salary increases for presidents of units of the university system and for the commissioner of higher education shall not exceed five percent (5%) each year of the biennium using the respective fiscal year 74-75 salaries previously approved by the regents as the basis for determining such increases." (Emphasis supplied.)

The question presented is whether this condition is a direction of academic policy or administration by the legislature. The Regents argue this condition represents an effort to abrogate

the powers and prerogatives granted expressly and absolutely to them by the 1972 Montana Constitution. The Governor and Finance Committee assert the condition is a proper exercise of the legislative appropriation power.

The problem of delineating the area forbidden to the legislature in conditioning appropriations of the university system is not easily resolved, as was noted by the Michigan Court of Appeals in Regents of University of Michigan v. State, 47 Mich. App. 23, 208 N.W.2d 871, 877, quoting from 55 Mich. L.Rev. 728, 729:

> "'While it must be recognized that the legislature's power to make appropriations to a constitutional university does not include and is separate from the power to control the affairs of such a university, the legislature can within reason attach conditions to its university appropriations. If a constitutional university accepts such conditioned funds, it is then bound by the conditions. There are not many decisions in this area, however, so the line between conditions the legislature can validly attach and those it cannot has not been drawn in a distinct fashion. Conditions which require the university to follow prescribed business and accounting procedures have generally been found to be void. The courts have also sustained conditions which require, on penalty of losing part of the appropriation, annual reports to the governor, and fair and equitable distribution of an appropriation among the departments of the university or maintenance of university departments. It has also been held that the legislature can properly make non-teaching employees subject to the state's workmen's compensation law, and can require loyalty oaths by the teachers. On the other side of the line, a condition that the university move a certain department of the school has been held to be invalidly attached, an attempt to limit the amount of funds that can be spent for a given department is likewise an invalid condition. It is clear that limits should be placed on the use of the conditioned appropriation, for without such limits the legislature could use the conditioned appropriation to strip the university of its constitutional authority.'" (Emphasis supplied.)

Clearly any decision with respect to appropriations affects the management of the university system to some degree. We assume the 1972 Constitutional Convention was aware of this

fact when it drafted Article V. That Article, as was noted, does not limit the legislature's power to appropriate funds for the university system. Therefore, we look to the impact of the appropriation condition on the management and control exercised by the Regents.

Returning now to the restrictions contained in Section 12, we note no legislative explanation of the breadth of the restrictions. Neither is there any provision for the Regents to object. The Regents either comply or forego the funds. Seemingly minor conditions could ultimately affect academic, administrative and financial matters of substantial importance to the system.

But, control over college president salaries is not a "minor" matter. It does dictate university personnel policy. That such effect was meant need only be found in the final sentence of the bill following Section 6 which states "The regents shall grant classified university employees salaries in accord with House Joint Resolution 37, forty-fourth legislature." Such a limitation on significant expenditures indicates a complete disregard for the Regents' constitutional power.

Inherent in the constitutional provision granting the Regents their power is the realization that the Board of Regents is the competent body for determining priorities in higher education. An important priority is the hiring and keeping of competent personnel. The limitation set forth in Section 12(6), H.B. 271, specifically denies the Regents the power to function effectively by setting its own personnel policies and determining its own priorities. The condition is, therefore, unconstitutional.

This opinion together with the companion opinion of State ex rel. Thomas L. Judge v. Legislative Finance Committee, Cause

No. 13201, decided today, shall constitute the declaratory judgment of this Court with regard to Issues 1) and 2) to be resolved in this action as set out in the order of this Court dated July 17, 1975.

The order of this Court dated July 2, 1975, staying further actions or proceedings by any party hereto or his agent outside the scope of this proceeding and the order dated July 7, 1975, directing the Governor and his agents, servants and employees to desist and refrain from withholding payment on warrants and claims submitted by the Montana university system, are vacated. The Regents shall have a reasonable time to complete their certification as to the other general matters contained in Section 12, H.B. 271.

_Wesley Castles_
Justice

We concur:

_James T. Harrison_
Chief Justice

_John Conway Harrison_

_Gene B. Daly_

_Frank I. Haswell_
Justices