Dear Senator Hobson,
¶ 0 This office has received your request for an Attorney General Opinion in which you ask, in effect, the following questions:
1. May the Legislature constitutionally empower the Governor toextend the "hiring freeze" contemplated by the provisions of 74O.S.Supp. 1995, § 840-2.14[74-840-2.14] to public institutions of highereducation within the Oklahoma State System of Higher Education?
2. In implementing a "hiring freeze," under the provisions of74 O.S. Supp. 1995, § 840-2.14[74-840-2.14], may the Governor vest his orher cabinet secretaries with the authority to approve or denyrequests for exceptions to the hiring freeze?
 I.
¶ 1 The gravamen of your first question is whether the Oklahoma Constitution prohibits the Legislature from authorizing the Governor to impose a "hiring freeze" on institutions in the Oklahoma State System of Higher Education. That system, as defined by Article XIII-A, § 1 of the Oklahoma Constitution, is composed of all institutions of higher education supported by legislative appropriations:
 All institutions of higher education supported wholly or in part by direct legislative appropriations shall be integral parts of a unified system to be known as "The Oklahoma State System of Higher Education."
¶ 2 Within the Oklahoma State System of Higher Education are institutions managed and controlled by either boards of regents created by the Constitution or boards of regents or trustees created by statute.
 APPLICATION OF THE HIRING FREEZE TO INSTITUTIONS GOVERNED BY CONSTITUTIONALLY CREATED BOARDS OF REGENTS
Board of Regents for the University of Oklahoma
¶ 3 Article XIII, § 8 of the Oklahoma Constitution establishes the Board of Regents for the University of Oklahoma and vests in that board the power of the government of the University:
 The government of the University of Oklahoma shall be vested in the Board of Regents consisting of seven members to be appointed by the Governor by and with the advice and consent of the Senate.
Okla. Const. art. XIII, § 8 (emphasis added).
¶ 4 In Board of Regents University of Oklahoma v. Baker,638 P.2d 464 (Okla. 1981), the Oklahoma Supreme Court held that, in elevating the status of the Board of Regents "from a statutory to a constitutional entity the people intended to limit legislative control over University affairs." 638 P.2d at 467. The Board of Regents in Baker challenged a joint resolution enacted by the Legislature which directed that all State agencies, including the Board of Regents, increase the salaries of all employees by six percent for the coming fiscal year. Finding that the legislative establishment of employee raises impermissibly interfered with the Board of Regents' constitutional power over the University's general government, the Court stated:
 We believe the finding by the trial court that the Legislature may fix and determine the manner in which raises are to be given to employees of the Board of Regents was erroneous. The determination of salary schedules and the compensation to be paid to the employees of the Board of Regents is an integral part of the general government of the University.
Baker, 638 P.2d at 468 (citation omitted).
¶ 5 In reaching this conclusion, the Oklahoma Supreme Court quoted with approval from a 1975 Montana case, Board of Regentsof Higher Education v. Judge, 543 P.2d 1323 (Mont. 1975). One of the legislatively imposed limits examined in Judge was a statute limiting the salary increases for university system presidents and the commissioner of higher education. Finding that such limitations indicated "a complete disregard for the Regents' constitutional power," the Judge court found that the Montana Constitution vested the board of regents with the power to determine priorities in higher education, and that one of the chief priorities is the hiring and keeping of competent personnel:
 Inherent in the constitutional provision granting the Regents their power is the realization that the Board of Regents is the competent body for determining priorities in higher education. An important priority is the hiring and keeping of competent personnel. The [statutory] limitation . . . specifically denies the Regents the power to function effectively by setting its own personnel policies and determining its own priorities. The condition is, therefore, unconstitutional.
Board of Regents University of Oklahoma v. Baker,638 P.2d at 467 (quoting with approval from Judge, 543 P.2d at 1335) (emphasis added).
¶ 6 The Baker rationale has equal force in the case at hand. The provisions of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14] contain several subsections dealing with the State's management of the costs of human resources. Included within the statute is a provision authorizing the Governor to implement a hiring freeze:
 As a further control of human resource costs, the Governor may declare a financial emergency or implement a freeze in hiring, by declaring this section to be in effect, provided, however, the University Hospitals Authority, including all hospitals or other institutions operated by the University Hospitals Authority, shall not be subject to the provisions of this subsection.
74 O.S.Supp. 1995, § 840-2.14[74-840-2.14](D).
¶ 7 The implementation of a hiring freeze, under this legislatively enacted provision, would directly interfere with an integral part of the general government of the University by the Regents. As in the case considered by the Montana Supreme Court in Judge, inherent in the Constitutional provisions granting the Board of Regents the power to provide for the government of the University is the Board's ability to determine priorities in higher education, and, as the Montana Supreme Court held inJudge, "[a]n important priority is the hiring and keeping of competent personnel." 543 P.2d at 1335. The hiring freeze provision of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14](D), if read to apply to institutions governed by the Board of Regents for the University of Oklahoma, would place the establishment of such priorities, by legislative direction, with the Governor, and not, as contemplated by Article XIII, § 8 of the Oklahoma Constitution, in the hands of the Board of Regents. Accordingly, we conclude that the hiring freeze provision of 74 O.S.Supp.1995, § 840-2.14[74-840-2.14](D), may not be applied to institutions governed by the Board of Regents for the University of Oklahoma.
Board of Regents of Oklahoma Colleges
¶ 8 The Oklahoma Constitution at Article XIII-B, § 1, creates the Board of Regents of Oklahoma Colleges. Section 2 of Article XIII-B describes the constitutionally granted powers of that Board of Regents:
 The said Board of Regents of Oklahoma Colleges shall hereafter have the supervision, management and control of the following State Colleges: Central State College at Edmond; East Central State College at Ada; Southwestern Institute of Technology at Weatherford; Southeastern State College at Durant; Northwestern State College at Alva, and the Northeastern State College at Tahlequah, and the power to make rules and regulations governing each of said institutions shall hereafter be exercised by and is hereby vested in the Board of Regents of Oklahoma Colleges created by this Act, and said Board shall appoint or hire all necessary officers, supervisors, instructors, and employees for such institutions.
Okla. Const. art. XIII-B, § 2 (emphasis added).
¶ 9 Like the Oklahoma University Board of Regents, the Board of Regents of Oklahoma Colleges is vested with constitutional powers regarding the government of the institutions under its charge. The Board is vested with the "supervision, management and control" of the colleges within their purview, and empowered "to make rules and regulations governing each of said institutions," and "shall appoint or hire all necessary officers, supervisors, instructors and employees for such institutions." Okla. Const. art. XIII-B, § 2 Under the principles announced in Board ofRegents University of Oklahoma v. Baker, 638 P.2d 464, 467
(Okla. 1981), the Oklahoma Constitution vests the Board of Regents with the power of "setting its own personnel policies and determining its own priorities." Application of the "hiring freeze" provision of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14](D) to institutions governed by the Board of Regents of Oklahoma Colleges would, thus, interfere with the Board's constitutionally vested powers. Decisions about the appointment and hiring of officers, supervisors, instructors and employees at the institutions under the Board's control directly relate to and affect judgments regarding the necessity of such employees. The hiring freeze authorized by Section 840-2.14 would substantially interfere with the Board's constitutional authority to make such judgments which is in conflict with Article XIII-B, §§ 1 and 2, and thus may not be extended to cover institutions governed by the Board of Regents of Oklahoma Colleges.
Board of Regents for Oklahoma Agricultural and MechanicalColleges
¶ 10 The Oklahoma Constitution at Article VI, § 31a creates the Board of Regents for the Oklahoma Agricultural and Mechanical College and all Agricultural and Mechanical Schools and Colleges:
 There is hereby created a Board of Regents for the Oklahoma Agricultural and Mechanical College and all Agricultural and Mechanical Schools and Colleges maintained in whole or in part by the State. The Board shall consist of nine (9) members, eight (8) members to be appointed by the Governor by and with the advice and consent of the Senate, a majority of whom shall be farmers, and the ninth member shall be the President of the State Board of Agriculture.
Okla. Const. art. VI, § 31a.
¶ 11 The remainder of Section 31a of Article VI goes on to indicate how vacancies on the Board are to be filled, the length of terms that members on the Board are to serve, how members of the Board may be removed from office, and provides for eligibility for appointment to the Board. Nowhere, however, does the section specifically enumerate the powers vested in the Board. An understanding of the nature and scope of the powers vested in the Board of Regents for Oklahoma Agricultural and Mechanical Colleges requires an analysis of the history of its predecessor.
¶ 12 As the Oklahoma Supreme Court noted in Board of RegentsOklahoma A. M. Colleges v. State Regents for Higher Education,497 P.2d 1062, 1066 (Okla. 1972), Section 31a of Article VI of the Oklahoma Constitution was a 1944 amendment to Section 31. Until the creation of the separate Board of Regents for Agricultural and Mechanical Colleges in Section 31a, the Board of Agriculture functioned as the Board of Regents under the authority of Article VI, § 31 of the Oklahoma Constitution:
 A Board of Agriculture is hereby created to be composed of five members all of whom shall be farmers and shall be selected in the manner prescribed by law.
 Said Board shall be maintained as a part of the State government, and shall have jurisdiction over all matters affecting animal industry and animal quarantine regulations, and shall be the Board of Regents of all State Agricultural and Mechanical Colleges, and shall discharge such other duties and receive such compensation as now is, or may hereafter be, provided by law.
Okla. Const. art. VI, § 31.
¶ 13 Shortly after statehood, in Trapp v. Cook ConstructionCompany, 105 P. 667 (Okla. 1909), the Oklahoma Supreme Court examined the powers granted the Board of Agriculture, when acting as the board of regents for the State agricultural and mechanical college. The issue presented in that case, as articulated by the Court, was whether "the board of agriculture, being constituted the board of regents of the agricultural and mechanical college, thereby have fixed and vested in it, by the language used, the duties, powers, and authority of the established territorial board of regents whose place it took, as the same existed at the time of the adoption of the Constitution?" Trapp, 105 P.at 669.
¶ 14 In addressing this issue, the Trapp Court noted that if the Board of Agriculture, in its role as Board of Regents, was so empowered, the Legislature could not divest the Board of any of those powers, or any portion of those powers:
 If so, necessarily the Legislature could not divest it [the Board] of these powers, nor any part thereof, for, if it could lawfully take a part, it could from time to time take more, and ultimately take all, and thereby defeat the will of the people who fixed the status of this board in the organic law of the state. As we view it, additional duties may be required, but none vested by the Constitution may be taken away by the Legislature.
Trapp, 105 P. at 669.
¶ 15 The Trapp Court concluded that the Board of Agriculture, in its role as Board of Regents, was vested with the powers vested in the territorial Board of Regents. In holding that Article VI, § 31 of the Oklahoma Constitution granted the Board of Regents for Agricultural and Mechanical Colleges the powers and duties vested in that board in the territorial law that existed at the time the Constitution was enacted, the Oklahoma Supreme Court took particular note of the language of Section 31 that provided that the Board "shall discharge such other duties. . . as . . . may hereafter be, provided by law." "If," the Court stated, "certain duties did follow [the Board's] creation and were not within the minds of the framers of this section of the Constitution, it seems clear to us that the word `other' would not have been used, but the phrase would have read that the board `shall discharge such duties . . . as may be provided by law.'" Trapp, 105 P. at 669.
¶ 16 Among the powers vested in the Board Regents under territorial law was "the government and management" of the agricultural and mechanical college. Trapp, 105 P. at 668. Thus, Section 31 of Article VI of the Oklahoma Constitution vested the Board of Agriculture, when acting as "the Board of Regents of all State Agricultural and Mechanical Colleges," with the same powers as those vested in the Board of Regents for Oklahoma University — the power over "the government" of the institutions within its jurisdiction.
¶ 17 Under the Oklahoma Supreme Court's analysis in Baker, an integral part of the power over the government of institutions within the jurisdiction of the Board of Regents is the power to set priorities, particularly priorities dealing with personnel matters. Baker, 638 P.2d at 468.
¶ 18 The enactment of Section 31a of Article VI by the people in 1944, as noted above, was an amendment to Section 31 of that article. Viewed in such light, the effect of the amendment was to bestow the powers of the Board of Regents — powers once exercised by the Board of Agriculture — upon the separately-created Board of Regents. Thus, the separately-created Board of Regents was vested with the same constitutional powers as those vested in the Board of Agriculture when it acted in that capacity. The separately-created Board of Regents for Oklahoma's Agricultural and Mechanical Colleges was accordingly vested with the power to provide for "the government and management" of the institutions within its purview. Trapp, 105 P. at 668.
¶ 19 Being vested with such governmental power, the Board of Regents of Oklahoma Agriculture and Mechanical Colleges — like the Board of Regents for the University of Oklahoma — is empowered to set personnel priorities. Application of the "hiring freeze" provided for at 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14](D) to the Board of Regents for Oklahoma Agricultural and Mechanical Colleges would thus substantially interfere with the Board's authority to set such priorities, and accordingly, would conflict with the provisions of Article VI, § 31a of the Oklahoma Constitution. Consequently, the hiring freeze provision of 74O.S.Supp. 1995, § 841-2.14[74-841-2.14](D) may not be extended to institutions governed by the Board of Regents for Oklahoma Agricultural and Mechanical Colleges.
¶ 20 We thus conclude that the hiring freeze provision of 74O.S.Supp. 1995, § 840-2.14[74-840-2.14](D), may not be extended to the institutions governed by the three constitutionally created Boards of Regents:
 1. The Board of Regents for the University of Oklahoma;
2. The Board of Regents of Oklahoma Colleges; and
 3. The Board of Regents for Oklahoma Agricultural and Mechanical Colleges.
¶ 21 No such constitutional limits, however, exist with respect to imposition of the hiring freeze upon institutions governed by statutorily created Boards of Regents.
 APPLICATION OF HIRING FREEZE TO INSTITUTIONS GOVERNED BY STATUTORY BOARDS OF REGENTS
¶ 22 Under Oklahoma's Constitution, "[t]he authority of the Legislature shall extend to all rightful subjects of legislation." Okla. Const. art. V, § 36. Thus, in Oklahoma "we do not look to the Constitution to determine whether the Legislature is authorized to do an act but rather to see whether it is prohibited" from acting. Draper v. State, 621 P.2d 1142, 1146
(Okla. 1980). Under the principles announced by the Oklahoma Supreme Court in Board of Regents University of Oklahoma v.Baker, the Constitution's vesting of governmental and management powers in the Board of Regents was held to constitute limits on the Legislature's power. Baker, 638 P.2d at 469. As discussed above, under those limits, the imposition of the hiring freeze provision of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14](D) upon the institutions under the control of the constitutional Boards of Regents would be impermissible.
¶ 23 The three constitutional Boards of Regents do not, however, govern all higher education institutions within the State. Rather, many colleges throughout the State are governed by separate statutorily created boards of regents or trustees. These regents and trustees are vested with the "supervision, management and control" or the "supervision and management" of the institutions under their authority. The regents of Murray State College, Eastern Oklahoma State College, University of Science and Arts, Northern Oklahoma College, Rogers State College, and the trustees of the University Center of Tulsa, are all expressly granted such powers in the statutes providing for their creation.[1]
¶ 24 The Board of Regents for Tulsa Junior College — is the "governing board" of that college and is vested with the power of "supervision and management" of the college. 70 O.S. 1991, §4413[70-4413]. Under the provisions of 70 O.S. 1991, § 4423[70-4423], the Boards of Regents for Redlands Community College, Carl Albert State College, Seminole Junior College, Rose State College and Oklahoma City Community College are vested with the same powers as the Board of Regents of Tulsa Junior College. Western Oklahoma State College's Board of Regents is also vested with like powers. 70O.S. 1991, § 4418[70-4418].
¶ 25 Other institutions in the system are vested with the same power by virtue of their enabling statutes.[2]
¶ 26 The power vested in all these Boards of Regents or Boards of Trustees is solely statutory power, unlike the situation presented by the constitutionally created Boards of Regents. Thus, none of the power vested in the statutory boards constitutes a restriction or limit on the Legislature's power. Accordingly, the Legislature possesses the power to authorize the Governor to include the institutions managed by these boards within any hiring freeze commenced under the provisions of 74O.S.Supp. 1995 § 840-2.14[74-840-2.14].
¶ 27 Whether it was the intention of the Legislature to include the statutory colleges and universities within the hiring freeze contemplated in 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14] is a different question. As always, in construing statutes to determine the intent of the Legislature, we begin by considering the statutory language used by the Legislature. E.g., Walker v. St. Louis-SanFrancisco Railway, 671 P.2d 672, 673 (Okla. 1983). Thus, we begin our analysis of this question by reviewing the language of Section 840-2.14, which provides:
 A. The intent of the Legislature is to increase individual agency skill and accountability in managing the costs associated with personnel and in applying controls that will enhance the ability of the State of Oklahoma to manage the overall costs of human resources as efficiently as possible, while continuing to maintain fairness to employees.
 B. All agencies, boards, and commissions shall report all reallocation decisions for both classified and unclassified positions and all adjustments to pay grades or salary assignments for classes in the unclassified service to the Office of Personnel Management on a quarterly basis. The Office of Personnel Management shall submit the quarterly reports to the Governor, the President Pro Tempore of the Senate, and the Speaker of the House of Representatives, along with an analysis of statewide reallocation decisions.
 C. All agencies, boards, and commissions shall report to the Office of Personnel Management on a quarterly basis all transactions in both the classified and unclassified service involving the establishment of new positions that have not been authorized specifically by legislative action. The Office of Personnel Management shall forward the quarterly reports to the Governor, President Pro Tempore of the Senate, and Speaker of the House of Representatives, accompanied by an analysis of agency decisions concerning such positions.
 D. As a further control on human resource costs, the Governor may declare a financial emergency or implement a freeze in hiring, by declaring this section to be in effect, provided, however, the University Hospitals Authority, including all hospitals or other institutions operated by the University Hospitals Authority, shall not be subject to the provisions of this subsection. During such periods, no audits of classified positions or reallocation of unclassified positions shall be initiated or conducted at the request of an agency except at the direction of the Governor. The provisions of the Oklahoma Personnel Act relating to agency-requested audits may be suspended during such periods to the extent that they are in conflict with this section. Provided, an audit at the request of an employee who files a classification grievance shall be conducted during such periods in accordance with the provisions of Section 840.22 of this title.
 E. The Office of Personnel Management shall establish due dates and specify the format for reports required by this section. Agencies that do not respond by the due dates shall be identified in a special section of the quarterly analysis reports forwarded to the Governor, President Pro Tempore of the Senate and Speaker of the House of Representatives.
 F. The provisions of this section shall not be construed to suspend the responsibility of any agency to ensure that the duties and responsibilities assigned to an employee are consistent with the current classification of the employee.
74 O.S.Supp. 1995, § 840-2.14[74-840-2.14] (emphasis added).
¶ 28 Subsection A of the statute indicates the primary purpose of the provision as a whole is to increase State agency skills and accountability in managing the costs associated with personnel, and to manage the overall cost of human resources as efficiently as possible.
¶ 29 The reporting provisions of subsections B and C indicate that the reports are to be provided by "[a]ll agencies, boardsand commissions," and that they cover both "classified andunclassified positions." Because Section 840-2.14 is part of the Oklahoma Personnel Act, 74 O.S. 1991, §§ 840.1[74-840.1] to 841.24 and (as renumbered) 74 O.S. Supp. 1995, §§ 840-1.1[74-840-1.1] to 840-6.9, we look to the definitions used in the act in construing the meaning of Section 840-2.14. As noted, that section speaks in terms of "[a]ll agencies." Under the provisions of 74 O.S.Supp. 1995, §840-1.3[74-840-1.3](1) the term "[a]gency" is defined to mean "any office, department, board, commission, or institution of the executivebranch of state government." The institutions making up the Oklahoma State System of Higher Education are all institutions within the executive branch of government, and thus fall within the Personnel Act's definition of "agency." While institutions within the Oklahoma State System of Higher Education are agencies, the positions at those institutions are unclassified positions. Title 74 O.S.Supp. 1995, § 840-5.5[74-840-5.5] lists the various State offices and positions that are in the unclassified service, indicating in pertinent part that positions within the institutions of The Oklahoma State System of Higher Education are not within the classified service:
 The following offices, positions, and personnel shall be in the unclassified service and shall not be placed under the classified service:
. . . .
 5. All officers and employees of The Oklahoma State System of Higher Education. . . .
74 O.S.Supp. 1995, § 840-5.5[74-840-5.5](A).
¶ 30 Offices and positions in the unclassified service arenot subject to the provisions of the Oklahoma Personnel Act or the rules and regulations promulgated under the act, save for leave regulations, unless otherwise provided by law. This is made clear by the provisions of 74 O.S.Supp. 1995, § 840-5.1[74-840-5.1], which in pertinent part reads:
 Unless otherwise provided, offices and positions in the unclassified service are in no way subject to any of the provisions of this act [the Oklahoma Personnel Act] or of the rules and regulations promulgated hereunder except leave regulations.
74 O.S.Supp. 1995, § 840-5.1[74-840-5.1] (emphasis added).
¶ 31 Because the positions at the institutions within the Oklahoma State System of Higher Education are unclassified and thus not subject to the provisions of the Oklahoma Personnel Act, unless otherwise provided, we look to Section 840-2.14, which includes the "hiring freeze" provision, to determine whether it was the intent of the Legislature to include those unclassified positions within the statute's purview.
¶ 32 We conclude that it was the intent of the Legislature to include both classified and unclassified positions within the provisions of Section 840-2.14, and accordingly conclude that the hiring freeze provision of that statute applies equally to classified and unclassified positions. First, the various subsections of Section 840-2.14, speak in terms of "[a]ll agencies," and in terms of personnel transactions dealing with both "classified and unclassified positions." Additionally, the intent provision of the Personnel Act specifies that it deals with the State's ability to manage overall costs of humanresources — which purpose could hardly be accomplished if the entire unclassified service of the State were excluded. For these reasons, we conclude that the Legislature intended that the provisions of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14], including its hiring freeze provision, apply to both classified and unclassified positions.
¶ 33 The only exclusion specifically provided for in the statute is that for "the University Hospitals Authority, including all hospitals and other institutions operated by the University Hospitals Authority." No other specific exemptions are provided. We do not read this single articulated exception to encompass all institutions within The Oklahoma State System of Higher Education. Accordingly, we conclude that the Legislature did not intend to exempt institutions within The Oklahoma State System of Higher Education under the management and control of statutory boards of regents or trustees from the provisions — including the hiring freeze provision — of 74 O.S.Supp. 1995, §840-2.14[74-840-2.14](D).
 II. USE OF CABINET OFFICERS IN IMPLEMENTING A HIRING FREEZE
¶ 34 The statute that requires the Governor to create a cabinet system for the Executive Branch of State government provides that:
The cabinet Secretaries shall:
 1. Advise the Governor of any policy changes or problems within the area they represent;
 2. Advise the entities represented of any policy changes or problems as directed by the Governor; and
 3. Coordinate information gathering for the Legislature as requested.
74 O.S. 1991, § 10.3[74-10.3](B).
¶ 35 This provision is part of the Executive Branch Reform Act of 1986, 74 O.S. 1991, § 10.1[74-10.1] to 10.3 and 74 O.S.Supp. 1995, §10.4[74-10.4]. In Opinion No. 88-3, the Attorney General concluded that "the Executive Branch Reform Act of 1986 [did] not create independent administrative or other authority in cabinet secretaries except such implied powers as are necessary to effectuate [the cabinet secretary's] advisory and information coordinating functions." Because implementation of the hiring freeze provision of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14](D) does not arise out of a cabinet secretary's advisory or information functions under the Executive Branch Reform Act of 1986, a cabinet secretary's power to participate in implementing a hiring freeze, cannot be founded in that act. Rather, if cabinet secretaries have such power, it must be found elsewhere.
¶ 36 The hiring freeze provision of 74 O.S.Supp. 1995, §840-2.14[74-840-2.14](D) specifically empowers the Governor to "implement a freeze in hiring" by declaring that section to be effective.
¶ 37 The Governor is, thus, expressly empowered to implement the hiring freeze. In empowering the Governor to "implement" a hiring freeze, the Legislature not only gave the Governor the responsibility of implementing a hiring freeze, but also vested him with broad powers to accomplish the mandate. The power to "implement" is commonly understood to be the power "to carry out," "to give practical effect to and ensure of actual fulfillment by concrete measures" and "to provide instruments or means of practical expression for." Webster's Third New International Dictionary 1134-35 (1981). The power to "implement," as that term is understood in common parlance, thus includes the power to provide the instruments and means of giving effect. Because the Legislature did not define "implement," rules of statutory construction require that we construe "implement" as it is used and understood in common parlance. Matter of IncomeTax Protest of Ashland, 751 P.2d 1070, 1073 (Okla. 1988). In the context of the hiring freeze, "implement" would include the power to design the freeze, establish exceptions, and designate the state officials — agents — to administer the plan.
¶ 38 Thus, we conclude that the Governor may, in an executive order implementing a hiring freeze, provide for exceptions, and select the officers — agents — to administer the freeze. Using cabinet secretaries to administer the freeze is not contrary to law. The cabinet secretaries' ability to aid the Governor, is derived not from the Executive Branch Reform Act of 1986 but rather from the powers conferred upon the Governor in the hiring freeze provision of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14](D) itself.
¶ 39 It is, therefore, the official Opinion of the AttorneyGeneral that:
1. The "hiring freeze" provision in 74 O.S.Supp. 1995, §840-2.14[74-840-2.14] may be extended by the Governor to include positionswithin institutions of The Oklahoma State System of HigherEducation, managed and controlled by statutory boards of regentsor boards or trustees.
2. The "hiring freeze" provision in 74 O.S.Supp. 1995, §840-2.14[74-840-2.14] may not, however, be extended to the institutionswithin The Oklahoma State System of Higher Education governed byconstitutionally created boards of regents:
a. The Board of Regents for the University of Oklahoma, Okla.Const. art. XIII, § 8;
b. The Board of Regents of Oklahoma Colleges, Okla. Const.art. XIII-B, §§ 1 and 2; and
c. The Board of Regents for Oklahoma Agricultural and MechanicalColleges, Okla. Const. art. VI, § 31a.
3. The hiring freeze provision of 74 O.S.Supp. 1995, § 840-2.14[74-840-2.14]expressly empowers the Governor to implement a hiring freeze. Anecessary element of this express power is the power to createexceptions from the freeze and the power to select the agents —such as cabinet secretaries — to administer the freeze byapproving or denying requests for exceptions to the hiringfreeze.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL
[1] Murray State College, 70 O.S. 1991, §§ 3407.1[70-3407.1] and 3407.2;
Eastern Oklahoma State College, 70 O.S. 1991, § 3512[70-3512];
University of Science and Arts, 70 O.S. 1991, § 3606[70-3606];
Northern Oklahoma College, 70 O.S. 1991, § 3706[70-3706];
Rogers State College, 70 O.S. 1991, § 3806[70-3806]; and
University Center at Tulsa, 70 O.S.Supp. 1995, § 4608[70-4608].
[2] The Trustees for the Ardmore Higher Education Program are vested with the same power as the Trustees for the University Center at Tulsa, 70 O.S. 1991, § 3213[70-3213].
The Trustees of both the McCurtain County and Enid Higher Education Programs are vested with the same powers and duties as those vested in the trustees for the Ardmore Higher Education Program. 70 O.S.Supp. 1995, § 4427[70-4427] and 70 O.S. 1991, § 4430[70-4430].
The Trustees for the University Center at Tulsa are vested with the same powers and duties as governing boards of other institutions in the system, 70 O.S.Supp. 1995, § 4604[70-4604].