FILED

06/29/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0605

DA 21-0605

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 128

BOARD OF REGENTS OF HIGHER EDUCATION
OF THE STATE OF MONTANA,

        Petitioner and Appellee,

   v.

THE STATE OF MONTANA, by and through
Austin Knudsen, in his official capacity as
Attorney General of the State of Montana,

        Respondent and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
                     In and For the County of Lewis and Clark, Cause No. BDV-2021-598
                     Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Austin Knudsen, Montana Attorney General, Kristin Hansen, Lieutenant
                General, David M.S. Dewhirst, Solicitor General, Kathleen L. Smithgall,
                Assistant Solicitor General, Helena, Montana

        For Appellee:

                Martha Sheehy, Sheehy Law Firm, Billings, Montana

                Ali Bovingdon, MUS Chief Legal Counsel, Helena, Montana

                Kyle A. Gray, Brianne C. McClafferty, Emily J. Cross, Holland & Hart
                LLP, Billings, Montana

        For Amici Curiae:

                Palmer A. Hoovestal, Hoovestal Law Firm, PLLC, Helena, Montana
                (for Western Montana Fish & Game Association, Inc.)

                Logan P. Olson, O'Toole Law Firm, Plentywood, Montana
                (for Daniels County)

Quentin M. Rhoades, Rhoades & Erickson PLLC, Missoula, Montana
(for Montana Shooting Sports Association)

Alexandria C. Kincaid, Attorney at Law, Emmett, Idaho
Donald E.J. Kilmer, Jr., Attorney at Law, Caldwell, Idaho
(for Second Amendment Foundation, Idaho Second Amendment Alliance,
and Madison Society Foundation, Inc.)

Greg Overstreet, Overstreet Law Group, Stevensville, Montana
(for Rep. Seth Berglee and 81 Legislators)

James H Goetz, Jeffrey J. Tierney, Goetz, Geddes & Gardner, P.C.,
Bozeman, Montana
Raph Graybill, Graybill Law Firm, P.C., Great Falls, Montana
(for Students, Faculty & University Employees)

Submitted on Briefs:  May 25, 2022

Decided:  June 29, 2022

Filed:

_____
Clerk

2

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    The State of Montana appeals from the December 13, 2021, Judgment and Permanent Injunction issued by the First Judicial District Court, Lewis and Clark County. We restate the issue on appeal as follows:

> *Whether the Board of Regents of Higher Education possesses the exclusive authority to regulate firearms on college campuses.*

¶2    We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    Since at least 2012, the Board of Regents of Higher Education (Board) has limited the use of and access to firearms on Montana University System (MUS) property through Board Policy 1006. That policy provides that the only individuals who may carry firearms on MUS campuses are "those persons who are acting in the capacity of police or security department officers" and have passed the requisite training or "those persons who are employees of a contracted private security company" and registered to carry firearms under Montana law.

¶4    In 2021, the Legislature enacted HB 102, which generally revises gun laws with respect to the open and concealed carry of firearms. Section 3 of HB 102 consists of several legislative findings relating to the Board and MUS and justifies the necessity of HB 102. Section 4 allows concealed carry "anywhere in the state" except for specific locations set forth by the Legislature. The Legislature did not extend an exception to the campuses and locations of the MUS. In Section 8 of HB 102, the Legislature amended § 45-3-111, MCA, regarding open carry, and deleted the prior MUS exemption, which did "not limit the

3

authority of [the Board] to regulate the carrying of weapons" on MUS campuses. These sections of HB 102 effectively eliminate Board Policy 1006 and extend both open and concealed carry of firearms to MUS campuses and locations.

¶5    In Section 5, HB 102 prohibits the Board "from enforcing or coercing compliance" with any rules diminishing or restricting the right to possess or access firearms, "notwithstanding any authority of the [Board] under Article X, section 9(2)(a), of the Montana constitution." Section 6 further prohibits the Board, with a few exceptions, from "regulat[ing], restrict[ing], or plac[ing] an undue burden on the possession, transportation, or storage of firearms on or within [MUS] property" by persons eligible to possess firearms under Montana or federal law and who meet minimum safety and training requirements. Section 7 creates a cause of action "against any governmental entity" for "[a]ny person that suffers deprivation of rights enumerated under" HB 102. Finally, the Legislature conditioned $1,000,000 in the MUS budget to implement the provisions of HB 102 upon the Board's waiver of its right to challenge HB 102 in court. The Governor signed HB 102 into law on February 18, 2021. All sections of HB 102, except Section 6, became effective upon its passage and approval. Section 6 became effective on June 1, 2021.

¶6    The Board filed a Petition for Declaratory Relief on May 27, 2021. The Board sought a declaration that HB 102 was unconstitutional as applied to the Board, the MUS, and the campuses of the MUS. The Board additionally sought injunctive relief precluding the application of HB 102's provisions to the Board, the MUS, and its campuses. The District Court issued a temporary restraining order that same day. After holding a show

4

cause hearing, the District Court converted the temporary restraining order to a preliminary injunction on June 7, 2021.

¶7    The State filed a motion for summary judgment on September 15, 2021, arguing that the Board did not have exclusive authority to regulate firearms on campuses. The Board filed a cross-motion for summary judgment on October 18, 2021, responding that Montana's Constitution vested full authority in the Board to regulate MUS campuses. The District Court held a hearing on the dueling motions on November 30, 2021, and issued its Order that same day.

¶8    The District Court concluded Sections 3 through 8 of HB 102 violated the Board's constitutional authority and thus were unconstitutional as applied to the Board. The District Court denied the State's motion for summary judgment, granted the Board's cross-motion for summary judgment, and permanently enjoined enforcement of Sections 3 through 8 of HB 102 against the Board and on MUS campuses. Judgment was entered on December 13, 2021. The State appeals.

## STANDARD OF REVIEW

¶9    We review the grant of summary judgment de novo, applying the same M. R. Civ. P. 56 criteria used by the district court. *Albert v. City of Billings*, 2012 MT 159, ¶ 15, 365 Mont. 454, 282 P.3d 704. Summary judgment is appropriate when the moving party demonstrates the absence of any genuine issues of material fact and stands entitled to judgment as a matter of law. *Albert*, ¶ 15. When there are cross-motions for summary judgment, a district court must evaluate each party's motion on its own merits. *Kilby Butte*

*Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2017 MT 246, ¶ 7, 389 Mont. 48, 403 P.3d 664. "On cross-motions for summary judgment, where the district court is not called to resolve factual disputes and only draw conclusions of law, we review the district court's conclusions of law to determine whether they are correct." *Kilby Butte Colony*, ¶ 7.

¶10 Statutes enjoy a presumption of constitutionality, and the party challenging a statute's constitutionality bears the burden of proving it unconstitutional beyond a reasonable doubt. *State v. Knudson*, 2007 MT 324, ¶ 12, 340 Mont. 167, 174 P.3d 469. An as-applied challenge alleges that a particular application of a statute is unconstitutional and thus depends on the facts of a particular case. *City of Missoula v. Mountain Water Co.*, 2018 MT 139, ¶ 25, 391 Mont. 422, 419 P.3d 685.

## DISCUSSION

¶11 The intent of the Framers controls our interpretation of a constitutional provision. *Butte-Silver Bow Local Gov't v. State*, 235 Mont. 398, 403, 768 P.2d 327, 330 (1989). We must discern the Framers' intent from the plain meaning of the language used and may resort to extrinsic aids only if the express language is vague or ambiguous. *Nelson v. City of Billings*, 2018 MT 36, ¶ 14, 390 Mont. 290, 412 P.3d 1058. Even in the context of clear and unambiguous language, however, we determine constitutional intent not only from the plain language, but also by considering the circumstances under which the Constitution was drafted, the nature of the subject matter the Framers faced, and the objective they sought to achieve. *Nelson*, ¶ 14. We must also consider that Montana's Constitution is a

6

prohibition upon legislative power, rather than a grant of power. *Board of Regents v. Judge*, 168 Mont. 433, 444, 543 P.2d 1323, 1330 (1975) (citations omitted).

¶12 Under the 1889 Montana Constitution, the Legislature possessed absolute authority over the Board, which was vested with "general control and supervision of the State University . . . [with] powers and duties [as] prescribed by law." Mont. Const. of 1889, art. XI, § 11. The 1972 Constitution removed the language subjecting the Board's powers and duties to legislative control and instead vested the Board with the "full power, responsibility, and authority to supervise, coordinate, manage and control the [MUS] and . . . supervise and coordinate other public educational institutions assigned by law." Mont. Const. art. X, § 9(2)(a). By the plain language of Mont. Const. art. X, § 9, the Board retains full independence over the MUS. However, the Board remains subject to the legislative powers to appropriate and audit, legislatively determined terms of office, and the oversight of additional educational institutions as prescribed by law. *See* Mont. Const. art. X, § 9(2)(b) (stating Board members are "appointed by the governor, and confirmed by the senate, to overlapping terms, as provided by law"); Mont. Const. art. X, § 9(2)(d) ("The funds and appropriations under the control of the [Board] are subject to the same audit provisions as are all other state funds."). Legislative oversight likewise remained the case for the constitutionally created Board of Public Education. Mont. Const. art. X, § 9(3) (creating the Board of Public Education "to exercise general supervision over the public school system" and dictating that "[o]ther duties of the board shall be provided by law.").

7

¶13    The 1972 Constitutional Convention's debate over Mont. Const. art. X, § 9, further helps determine the Framers' intent regarding the Board's constitutional authority. The debate reveals the Framers intended to place the MUS outside the reach of political changes of fortune and instead in the hands of a Board which remained directly responsible and accountable to Montanans.[1]  Indeed, the Framers recognized the importance of independent and unfettered academic freedom:

> [A] more subtle kind of coercion has made its appearance, and it is of the sort which is likely to become an even greater threat to the integrity of higher education in the future.  This is the growing power of the centralized, bureaucratic state.  Without overtly intending to curtail freedoms, the modern state has absorbed an increasing amount of power and control in the name of efficiency.

Montana Constitutional Convention, Committee Proposals, February 22, 1972, Vol. II, p. 737.  The contemporary understanding at the time of the Constitution's ratification was "that the convention intended that the [Board] should be a quasi-independent state department subject only to indirect legislative control through appropriation, audit, confirmation of gubernatorial appointments and assignment of other educational

---

[1] *See* Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, Vol. VI, p. 2057:

> [I]f a board is created for higher education and given the responsibility for education but not the authority to carry out such responsibility, how can they be held accountable to the people?  If the real authority for carrying out the policies of higher education is dispersed among the bureaucratic political frameworks of other agencies, who then is accountable to the public?  A healthy post-secondary educational system must have freedom from political changes of fortune, while still maintaining its responsibility and accountability to the state.

institutions for their supervision." Hugh V. Schaefer, *The Legal Status of the Montana University System under the New Montana Constitution*, 35 Mont. L. Rev. 189, 198 (1974).

¶14    Our jurisprudence has, to some extent, refined the boundaries of the Board's constitutional independence. Shortly after the 1972 Constitution's adoption, the Board and Legislature clashed over their respective constitutional authorities as related to conditional appropriations. In *Judge*, the Legislature set several conditions and restrictions on MUS funding. *Judge*, 168 Mont. at 437-41, 543 P.2d at 1326-29. We rejected the Board's contention that it was effectively a fourth branch of government and thus not subject to any legislative power. *Judge*, 168 Mont. at 442-43, 543 P.2d at 1329. We noted that the Board was not mentioned "in either Article III, Section 1, which creates the three branches of government, nor in Article V, which limits the powers of the legislature." *Judge*, 168 Mont. at 451, 543 P.2d at 1333. However, we also noted that "the legislature is not mentioned in Article X, Section 9(2), which entrusts the government and control of the university system to the [Board]." *Judge*, 168 Mont. at 451, 543 P.2d at 1333. We framed a restriction on salary increases for MUS presidents as "whether this condition is a direction of academic policy or administration by the legislature" and looked to the impact of the Legislature's decision "on the management and control exercised by the Regents." *Judge*, 168 Mont. at 453-54, 543 P.2d at 1334-35. We rejected the condition restricting salary increases because it "could ultimately affect academic, administrative and financial matters of substantial importance to the [MUS,]" and noted that it "specifically den[ied] the Regents the power to function effectively by setting its own personnel policies and

9

determining its own priorities." *Judge*, 168 Mont. at 454, 543 P.2d at 1335.[2] We deemed that "[i]nherent in the constitutional provision granting [the Board] their power is the realization that the Board of Regents is the competent body for determining priorities in higher education." *Judge*, 168 Mont. at 454, 543 P.2d at 1335. *Judge*, thus, prescribes case-by-case consideration of the impact of legislative actions upon the Board's constitutional authority.[3]

¶15    In *Duck Inn v. Montana State University-Northern*, we addressed a statute allowing the Board to lease MUS facilities for purposes of revenue production. *Duck Inn*, 285 Mont. 519, 525, 949 P.2d 1179, 1183 (1997). The issue on appeal was not whether the power to do so fell within the Board's authority, but rather whether the statute constituted an unconstitutional delegation of legislative authority because it left leasing decisions to the Board's discretion. *Duck Inn*, 285 Mont. at 525, 949 P.2d at 1182 ("The Duck Inn . . .

---

[2] *Judge* echoed the Framers' debate over whether the Board's activities would cover three general areas: academic, administrative, and financial matters as they affected the MUS. *See* Montana Constitutional Convention, Committee Proposals, February 22, 1972, Vol. II, p. 735 (original committee proposal language providing the Board "shall govern and control the academic, financial, and administrative affairs" of the MUS.). This language was subsequently deleted to "avoid certain types of objections. . . . [and] achieve a Board of Regents that has the essential powers to carry on the work of the University System." Montana Constitutional Convention, Verbatim Transcript, March 13, 1972, Vol. VI, p. 2116.

[3] Relying on *Judge*, Montana's Attorney General issued an opinion in 1984 regarding the legislative appropriation of excess bond revenue raised by the Board. 40 Op. Att'y Gen. Mont. No. 67. The Attorney General concluded that, where legislative action would effectively eliminate the Board's statutory and constitutional authority over matters concerning the MUS, the Legislature could not act. 40 Op. Att'y Gen. Mont. No. 67 at 266-67. Attorney General opinions are binding unless overruled by a state district court or the Montana Supreme Court. Section 2-15-501(7), MCA.

argu[es] that § 20-25-302, MCA (1993), constitutes an unconstitutional delegation of legislative power because it fails to prescribe a policy, standard or rule for implementing the powers delegated to an administrative agency."). Recognizing that the Board has "authority over the [MUS] which is independent of that delegated by the legislature" and adopting United States Supreme Court precedent, we concluded the delegation was permissible. *Duck Inn*, 285 Mont. at 526, 949 P.2d at 1183.

¶16 The State reads *Duck Inn* broadly, arguing our holding there supports its position that the Legislature may enact laws concerning MUS property despite the Board's inherent constitutional authority.[4] *Duck Inn*, however, does not support the State's position. The statute at issue in *Duck Inn*, § 20-25-302, MCA, predated the 1972 Constitution and thus arose under the 1889 Constitution, wherein the Board's duties were "prescribed and regulated by law." *See* Mont. Const. of 1889, art. XI, § 11; § 75-8503(5), RCM (1947). The delegation in *Duck Inn*, thus, did not infringe upon the Board's inherent constitutional authority. Rather, the delegation worked in tandem with the Board's authority, which the Court relied on to place less stringent limitations on the preexisting legislative delegation at issue. *See Duck Inn*, 285 Mont. at 526, 949 P.2d at 1183. *Duck Inn*, thus, did not address

---

[4] The State further points to several laws applicable on MUS campuses as evidence that the Legislature may regulate the MUS. The State's reliance on these laws presupposes conflict between the Board and the Legislature and attempts to misdirect from the issue at hand—whether the Legislature may *infringe* upon the Board's constitutional authority, not whether the Legislature may regulate MUS as a general matter.

11

whether the Board possessed *sole* constitutional authority to make decisions regarding its properties.

¶17 Implied in the Board's broad powers "is the power to do all things necessary and proper to the exercise of its general powers." *Sheehy v. Comm'r of Political Practices for Mont.*, 2020 MT 37, ¶ 29, 399 Mont. 26, 458 P.3d 309; *see also* § 20-25-301, MCA. Indeed, the Board "has not only the power, but also the constitutional and statutory duty to ensure the health and stability of the MUS." *Sheehy*, ¶ 29. *Sheehy*, our most recent case concerning the Board, addressed the applicability of the Montana Code of Ethics to the Board and whether a Board member's actions in support of an MUS mill levy violated the Ethics Code. *Sheehy*, ¶ 3. We concluded that the Commissioner of Political Practices lacked jurisdiction to enforce the Ethics Code against members of the Board because the Commissioner's jurisdiction extended to state officers, legislators, or state employees, not members of independent rulemaking bodies such as the Board. *Sheehy*, ¶¶ 23-25. We also concluded that public support of the mill levy fell within a Board member's constitutional and statutory duties and thus did not violate the Ethics Code. *Sheehy*, ¶ 29. However, we were not asked to resolve the issue of whether the Legislature possessed the power to apply the Ethics Code to the Board. Moreover, the Ethics Code is a set of neutral statewide laws prohibiting conflicts of interest by officers and employees of state government, not a set of laws specifically singling out the Board or its constitutional powers and duties. *Sheehy*,

¶¶ 16-18. Unlike *Sheehy*, HB 102 is aimed directly at the Board and squarely implicates the Board's constitutional authority. The State's reliance on *Sheehy* is unavailing.[5]

¶18   The State asserts the Board's constitutional authority is limited to academic, financial, and administrative matters and that HB 102 revoked any previously delegated power to regulate firearms. The Board counters that its constitutionally granted authority necessarily includes the power to regulate firearms on MUS campuses and that the Legislature, through HB 102, infringed upon this authority.

¶19   We agree that HB 102 unconstitutionally infringes upon the Board's responsibility to oversee the MUS. The Board and the Legislature derive their respective power from the same authority—the Montana Constitution. The Constitution defines the powers of each and imposes limitations upon those powers. Absent language to the contrary, a direct power conferred upon one necessarily excludes the existence of such power in the other. This fundamental premise lies at the very root of the constitutional system of government. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176-77, 2 L. Ed. 60, 73 (1803) ("The distinction, between a government with limited and unlimited powers, is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation."). The Board, and MUS, are not mentioned in Mont. Const. art. V, which imparts the legislative power, and corresponding limitations, upon the

---

[5] The State's attempts to frame HB 102 as a generally applicable safety law are likewise unavailing, as the amicus brief of 81 state legislators who supported HB 102 states that the Legislature specifically aimed to counter Board Policy 1006.

13

Legislature. However, nor is the Legislature mentioned in Mont. Const. art. X, § 9(2), which entrusts the Board with the full governance and control of the MUS. No reasonable rule of construction permits either body to encroach upon or exercise the powers constitutionally conferred upon the other. Application of HB 102 to MUS, and the Board, would give the Legislature control and supervision over MUS campuses and render the Board ministerial officers with no true authority other than to effectuate the Legislature's will. Such application directly contradicts the constitutionally granted powers of the Board and undermines the Board's ability to govern the MUS, while expanding the Legislature's power in contravention of the express constitutional language of Mont. Const. art. X, § 9(2). Montana's Constitution serves as a limitation on the Legislature, not a grant of power. *See Judge*, 168 Mont. at 444, 543 P.2d at 1330. Exercise of the legislative power to undermine the constitutional powers of the Board cannot stand.

¶20 The State relies upon *Judge* to argue the Board's authority remains limited to academic, administrative, and financial matters concerning the MUS. The Board's constitutional authority includes those matters. However, contrary to the State's argument, Board Policy 1006 relates directly to the academic and administrative operations of the MUS. Applying, as it does, solely to individuals while they are on MUS campuses or properties, Board Policy 1006 reflects the Board's judgment on an issue undoubtedly within the scope of its constitutional authority under Mont. Const. art. X, § 9(2)(a)—the

14

appropriate means by which to maintain a safe, secure, and orderly educational environment in its classrooms and on its campuses and properties.[6]

¶21 While the mission of the MUS remains teaching, research, and public service, the Board has determined through Board Policy 1006 that the presence of firearms on MUS campuses presents an unacceptable risk to a safe and secure educational environment, thus undermining these goals. The Board manages instructional facilities, laboratories, recreational facilities, student residential housing, food services, and a host of other operations. Students, faculty, and support personnel rely on the Board to assess security risks and make decisions that will enhance the safety, security, and stability of the educational environment as a whole, consistent with the MUS mission. Thus, maintaining a safe and secure educational environment falls squarely within the Board's constitutional authority under Mont. Const. art. X, § 9(2)(a), affording the Board the power to protect MUS campuses so that the educational and administrative goals of the MUS are realized. Board Policy 1006 arises from this necessity and reflects the Board's assessment that firearms threaten the safety and security of the educational environment it strives to obtain. In addition to limiting the carrying of firearms on MUS campuses, Board Policy 1006 delegates the control and direction of campus police and security departments to the presidents of each MUS campus. It is particularly germane and necessary to the Board's

---

[6] Answering the narrow issue on appeal—the scope of the Board's authority under Mont. Const. art. X, § 9(2)(a)—does not require any further substantive assessment of Board Policy 1006, which is not at issue in this case.

15

constitutional authority that it can manage MUS campuses by implementing policies it believes will minimize the loss of life and thereby strengthen its educational environment. While the mission of the Board is education, the reality is that campus safety and security is an integral responsibility of the Board and its mission.

¶22 Finally, we note that Board Policy 1006 recognizes that Montana is not immune from the catastrophic loss that follows the use of firearms on school campuses. In *State v. Byers*, 261 Mont. 17, 23-24, 861 P.2d 860, 864 (1993) (overruled on other grounds by *State v. Rothacher*, 272 Mont. 303, 901 P.2d 82 (1995)), this Court affirmed Byers's deliberate homicide conviction for shooting and killing two students in their dorm room at Montana State University. We likewise have recognized, in *Peschke v. Carroll College*, 280 Mont. 331, 337-38, 929 P.2d 874, 878 (1996), that a college could breach its duty to provide a reasonably secure and safe place to work. *Peschke* involved a fatal shooting on Carroll College's campus which a jury determined did not constitute a breach of the College's duty to provide a safe and secure work environment. *Peschke*, 280 Mont. at 338-39, 929 P.2d at 878. This Court affirmed the jury's verdict that there was no breach of the College's duty. *Peschke*, 280 Mont. at 339, 929 P.2d at 878.

¶23 Conversely, with limited exceptions, HB 102 prohibits the Board from regulating the possession, transportation, or storage of firearms on MUS campuses. By expressly proscribing the Board from regulating firearms on MUS campuses, HB 102 functions as a legislative directive of MUS policy and undermines the management and control exercised by the Board to set its own policies and determine its own priorities. The Board, not the

16

Legislature, is constitutionally vested with full authority to determine the priorities of the MUS. *See Judge*, 168 Mont. at 454, 543 P.2d at 1335. HB 102 sought to undermine this constitutional authority and thus cannot be applied to the Board and MUS properties.

¶24 Our holding does not, as the State contends, elevate the Board and MUS to a fourth branch of government or provide the Board veto power over state laws it disagrees with. Rather, we conclude that, where legislative action infringes upon the constitutionally granted powers of the Board to supervise, coordinate, manage, and control the MUS, the legislative power must yield.

## CONCLUSION

¶25 The Board is constitutionally vested with full responsibility to supervise, coordinate, manage, and control the MUS and its properties. The regulation of firearms on MUS campuses falls squarely within this authority. As applied to the Board, Sections 3 through 8 of HB 102 unconstitutionally infringe upon the Board's constitutionally derived authority. The District Court's Judgment is affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE
/S/ JOHN W. PARKER
District Judge
sitting in place of Justice Ingrid Gustafson

17